THE STATE OF OHIO, APPELLANT AND CROSS-APPELLEE, *v.* WARNER, APPELLEE AND CROSS-APPELLANT.

[Cite as State *v.* Warner (1990), 55 Ohio St. 3d 31.]

(Nos. 89-584 and 90-84—Submitted June 6, 1990—Decided October 26, 1990.)

---

[1] The court of appeals vacated the $250,000 costs of prosecution assessed against Warner. The court found that the award was based on a "statement of costs" submitted by the prosecution which was not certified by the clerk of the court of common pleas pursuant to R.C. 2949.14. Since the state has not appealed this judgment ordering a remand on the issue of costs, we will not address the merits of whether R.C. 2949.14 requires certification of the bill of costs before the trial court's order is valid. Nevertheless, because we reinstate Warner's conviction, we note that on re-mand from the court of appeals to the trial court the prosecution may resubmit its statement of costs.

[2] A repurchase agreement is similar to a collateralized loan, with the security subject to repurchase pledged as collateral. The repurchase agreements between Home State and ESM were of two types. In the first type of transaction, Home State "sold" securities in its investment portfolio to ESM, subject to Home State's obligation to repurchase and ESM's obligation to convey the securities at a later date for a

specified price. The funds paid by ESM to Home State for the securities in effect constituted a loan to Home State from ESM, with the securities pledged by Home State serving as collateral. Home State periodically paid interest on the borrowed funds and received the coupon interest paid on the securities. In the second type of transaction, Home State purchased securities at a discounted price, and ESM simultaneously extended to Home State a loan, collateralized by the securities purchased. Again, Home State agreed to repurchase and ESM agreed to reconvey the securities at a later date, and Home State's interest payment came due on that date. In both types of transaction, the security subject to repurchase passed into ESM's possession for the term of the repurchase agreement and could be sold by ESM to third parties under an additional repurchase agreement.

Whether a transaction is characterized as a repurchase agreement or a reverse repurchase agreement depends on whether the transaction is viewed from the perspective of the party supplying funds or the party acquiring funds. Viewed from Home State's perspective, the transactions were reverse repurchase agreements because Home State was "selling" securities and "borrowing" funds rather than "buying" securities and "lending" funds.

[3] A "day trade" is the sale of a security made prior to the date that the purchase price of the security is required to be paid or settled.

---

[4] As the state notes in its brief, the hedge was designed to protect Home State only against fluctuations in the market price of the $300,000,000 in GNMAs and the $400,000,000 in treasury notes Home State was purchasing from ESM through leveraged arbitrages. The hedge did not protect Home State against the huge risk of loss created by its overcollateralization with ESM. Thus, regardless of the amount of funds Home State received or was required to pay with respect to the futures market, Home State's enormous risk of loss with ESM stayed constant.

---

[5] On February 27, 1984, the SEC sent to HSFI its first comment letter on the S-2, focusing on the risks associated with Home State's day trades and HSFI's apparent inability to pay off the debentures because of the company's "continuous losses before equity in partially owned subsidiaries." HSFI responded to the SEC's comments by filing an amendment to the S-2 on April 13, 1984. Gary P. Kreider, a Cincinnati area attorney who was hired to assist HSFI in the SEC approval process, spoke with Warner on April 25, 1984, and explained the importance of Warner's review of the S-2. Warner agreed to review the materials and call Kreider if he had any changes.

On May 9, 1984, the SEC responded to HSFI's S-2 amendment with additional comments, focusing on Home State's anomalous transactions with ESM. HSFI filed a second amendment to the S-2 on May 25, 1984. The SEC, again not satisfied with HSFI's S-2 disclosures, issued a third comment letter on June 8, 1984. HSFI amended its S-2 a third time on July 13, 1984. The SEC issued its fourth comment letter on August 7, 1984 and inquired into the details of Home State's risk of loss in the ESM transactions. The SEC demanded a written response to its letter before any further S-2 amendments were filed. On August 24, 1984, the SEC sent a fifth comment letter which expressed extreme concern about the risk of loss to Home State if ESM went bankrupt.

38

[6] The merger required approval from both the ODSLA and ODGF. Warner met with ODGF officers Donald R. Hunsche and Charles Mayleben to discuss the merger. Mayleben, who was responsible for analyzing the financial impact of the merger on Home State and the ODGF, noted that the merger would substantially reduce the net worth of the bank. Accordingly, ODGF decided not to approve the merger without a sufficient infusion of capital from Warner to make up for the resulting reduction in Home State's net worth. Warner therefore contributed real estate which, according to his appraisal, had a net value of approximately $18,000,000. By virtue of the merger, Warner traded an $18,000,000 capital investment for the right to use Home State funds to pay off HSFI's $29,000,000 debenture debt.

The ODGF agreed to the merger subject to certain conditions negotiated with Warner. Warner, however, refused to guarantee the net worth of the merged entity and refused to become a director of Home State.

To secure expedited approval for the merger, Warner called the superintendent of ODSLA, Charles Lawrence Huddleston, to insist that the merger be approved. On August 27, 1984, Huddleston agreed to approve the merger, based upon Warner's promise to provide ODSLA with all information it requested, including audited financial statements of the merged entity, opinions from counsel on the tax consequences and accounting treatment of the merger, and Warner's personal financial statement (since he had guaranteed the sale price of the real estate). At no time during these merger discussions was ODSLA or ODGF told of the difficulty HSFI was having in obtaining SEC approval of the S-2 because of Home State's relationship with ESM. Both Mayleben and Huddleston testified that information regarding the SEC's continuing questions about the ESM transactions would have affected their consideration of the requested merger by Warner.

40

*Lawrence A. Kane, Jr.,* special prosecutor, *Mark A. Vander Laan, Carl J. Stich, Jr., Kenneth S. Resnick, Paul R. Mattingly* and *M. Gabrielle Hils,* for appellant and cross-appellee.

*Miller, Cassidy, Larroca & Lewin, William H. Jeffress, Jr., R. Stan Mortenson* and *Julia E. Guttman; Lawrence Herman, Louis A. Jacobs* and *Robert R. Hastings, Jr.,* for appellee and cross-appellant.

HOLMES, J. Because Warner and Schiebel were tried together, numerous issues presented on appeal by the state and on cross-appeal by the defendants are intertwined. To avoid duplication, we have resolved issues common to both defendants in either the instant case or *State* v. *Schiebel* (1990), 55 Ohio St. 3d 71, 564 N.E. 2d 54.

### 89-584

In case No. 89-584, the issues are whether there was clear and convincing evidence that Warner was unavoidably prevented from timely filing his motion for a new trial, and whether the *aliunde* rule incorporated into Evid. R. 606(B) was violated. For the reasons

expressed in *State* v. *Schiebel, supra,* we hold that the court of appeals erred in substituting its judgment for that of the trial court. Thus, the judgment of the court of appeals is reversed.

### 90-84

### I

### Special Prosecutor

On cross-appeal, Warner's first proposition of law maintains that the appointment of the special prosecutor violated the principle of separation of powers embodied in the Ohio Constitution. Defendant claims that the legislation creating the special prosecutor in this case compelled the special prosecutor to act in a particular manner and, therefore, the General Assembly, not the Governor, directed the substance of the special prosecutor's duties. Further, defendant claims that the legislation unconstitutionally divested the executive department of its absolute discretion to decide whether to investigate and prosecute a particular matter.

As a preliminary issue we note, as did the court of appeals, that both defendants waived the issue of the constitutionality of the office of special prosecutor as established by Am. S.B. No. 147 by not challenging the legislation at trial. However, due to the importance of the legislation and its effects on the parties, we will examine the merits of this issue.

In response to the collapse of Home State and other Ohio savings and loan institutions, the General Assembly promulgated Am. S.B. No. 147[7] ("the Act"), which "[r]equire[d] that the special prosecutor appointed

---

[7] Initially, the General Assembly promulgated Am. Sub. S.B. No. 119 to deal with the crisis surrounding the Home State failure. 141 Ohio Laws, Part I, 300. Later, the legislation was amended in Am. Sub. S.B. No. 134, 141 Ohio Laws, Part I, 350, and Am. S.B. No. 147, 141 Ohio Laws, Part I, 387. In regard to the special prosecutor's

under S.B. 119 of the 116th General Assembly to investigate and prosecute any criminal violations relating to the

power, Section 5 of Am. Sub. S.B. No. 119, as amended in Am. Sub. S.B. No. 134 and Am. S.B. No. 147, now provides:

"A special prosecutor shall be appointed by the attorney general to investigate and prosecute any criminal violations that may have been committed in connection with any events and circumstances that caused any savings and loan association to be placed in the possession of a conservator as of March 15, 1985, and any criminal activity by any depositor, investor, director, officer, or employee of any savings and loan association, any unlawful activity in the operation of any savings and loan association, or any unlawful activity by any state officer or employee in connection with the regulation, examination, inspection, or operation of any savings and loan association or any deposit guaranty fund or any person with whom an association had any contractual relationship.

"The special prosecutor also shall investigate and prosecute any criminal violations by any public official or any other person that may have been committed in connection with any events and circumstances that caused any municipal corporation in this state to suffer substantial financial losses as a result of transactions with E.S.M. Government Securities, Inc., of Fort Lauderdale, Florida, for which a receiver was appointed on March 4, 1985. The special prosecutor also may investigate any other conduct by a public official or any other person in connection with such transactions involving a municipal corporation that likely would give rise to civil liability. * * *

"The special prosecutor appointed pursuant to this section has the authority of special counsel designated by the attorney general, as set forth in section 2939.10 of the Revised Code.

"In carrying out his duties under this section, the special prosecutor shall have the power to direct the clerk of any court of common pleas within the state to issue any subpoena or similar process that the special prosecutor considers necessary or appropriate to the conduct of his investiga-

closing of the Home State Savings Bank [and] also investigate and prosecute criminal violations by any public

tion. A clerk of court who is directed to issue any such subpoena or similar process by the special prosecutor promptly shall issue the subpoena or similar process. Testimony and documents compelled by such subpoena or similar process shall be delivered in private, and only the witness subpoenaed, the witness' counsel, the special prosecutor, members of the special prosecutor's staff, and, for the purpose of taking the evidence, a stenographer or operator of a recording device may be present during the giving of any testimony or the production of any documents pursuant to the subpoena or similar process. Any testimony or documents obtained through use of a subpoena or similar process issued pursuant to this section shall be used by the special prosecutor or his staff only in the performance of the duties of the special prosecutor. The powers herein enumerated shall be in addition to any other powers the special prosecutor has under other provisions of the Revised Code and the Ohio Rules of Criminal Procedure, and shall terminate upon the special prosecutor's completion of his duties under this section. This section shall not preclude a person charged with any offense from exercising any existing right of access to any testimony or documents obtained pursuant to this section.

"Notwithstanding the restrictions on divulging information contained in Chapter 1155. of the Revised Code, the special prosecutor appointed under this section may utilize his powers and authority granted under this section to review and make copies of any information relevant to his investigation under this section that the superintendent of building and loan associations, or any of his deputies, assistants, clerks, or examiners have obtained in or as a result of an examination or by reason of their official positions, and the superintendent, and his deputies, assistants, clerks, or examiners shall provide the special prosecutor with any such information requested in accordance with this section." 141 Ohio Laws, Part I, 387-389.

official or other person relating to financial losses incurred by any municipal corporation as a result of transactions with E.S.M. Government Securities, Inc." Committee Comment to Am. S.B. No. 147. The purpose behind the Act was to require the Ohio Attorney General to appoint a special prosecutor to investigate and prosecute criminal violations committed in connection with events leading to the naming of a conservator for Home State. *Id.* The special prosecutor was commissioned, through Am. S.B. No. 134, with the same powers county prosecuting attorneys have under R.C. 2939.10.[8] *Id.* at 1-2.

We begin this analysis with the presumption that the Act is constitutional, and it will not be declared unconstitutional unless it "appear[s] beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible." *State, ex rel. Dickman,* v. *Defenbacher* (1955), 164 Ohio St. 142, 57 O.O. 134, 128 N.E. 2d 59, paragraph one of the syllabus; *State, ex rel. Jackman,* v. *Cuyahoga Cty. Court of Common Pleas* (1967), 9 Ohio St. 2d 159, 161, 38 O.O. 2d 404, 405, 224 N.E. 2d 906, 908-909 ("* * * when an enactment of the General Assembly is challenged, the challenger must overcome a strong presumption of constitutionality").[9] Although the federal Constitution is a grant of power to the federal Congress, the state Constitution is primarily a limitation on legislative power of the General Assembly; therefore, the General Assembly may pass any law unless it is specifically prohibited by the state or federal Constitutions. *Jackman, supra,* at 161-162, 38 O.O. 2d at 405, 224 N.E. 2d at 909.

In discussing the doctrine of separation of powers, we stated in *South Euclid* v. *Jemison* (1986), 28 Ohio St. 3d 157, 158-159, 28 OBR 250, 251-252, 503 N.E. 2d 136, 138, that:

"* * * While Ohio, unlike other jurisdictions, does not have a constitutional provision specifying the concept of separation of powers, this doctrine is implicitly embedded in the entire framework of those sections of the

---

[8] R.C. 2939.10 provides, in part:
"* * * In all matters or cases which the attorney general is required to investigate or prosecute by the governor or general assembly, or which a special prosecutor is required by section 177.03 of the Revised Code to investigate and prosecute, the attorney general or the special prosecutor, respectively, shall have and exercise any or all rights, privileges, and powers of prosecuting attorneys, and any assistant or special counsel designated by the attorney general or special prosecutor for that purpose, has the same authority. Proceedings in relation to such matters or cases are under the exclusive supervision and control of the attorney general or the special prosecutor."

[9] See, further, *State, ex rel. [Poe],* v. *Jones* (1894), 51 Ohio St. 492, 503-504, 37 N.E. 945, 948, where this court analyzed the legislative power:

"In determining whether an act of the legislature is or is not in conflict with the constitution, it is a settled rule, that the presumption is in favor of the validity of the law. The legislative power of the state is vested in the general assembly, and whatever limitation is placed upon the exercise of that plenary grant of power must be found in a clear prohibition by the constitution. The legislative power will generally be deemed ample to authorize the enactment of a law, unless the legislative discretion has been qualified or restricted by the constitution in reference to the subject matter in question. If the constitutionality of the law is involved in doubt, that doubt must be resolved in favor of the legislative power. The power to legislate for all the requirements of civil government is the rule, while a restriction upon the exercise of that power in a particular case is the exception. * * *"

Ohio Constitution that define the substance and scope of powers granted to the three branches of state government. See *State* v. *Harmon* (1877), 31 Ohio St. 250. See, also, *State, ex rel. Bryant,* v. *Akron Metro. Park Dist.* (1929), 120 Ohio St. 464. While no exact rule can be set forth for determining what powers of government may or may not be assigned by law to each branch, *Harmon, supra,* at 258, '* * * [i]t is nevertheless true, in the American theory of government, that each of the three grand divisions of the government, must be protected from encroachments by the others, so far that its integrity and independence may be preserved. * * *' *Fairview* v. *Giffee* (1905), 73 Ohio St. 183, 187.''

In the case at bar, the General Assembly retained no powers of appointment, removal, supervision or review over the special prosecutor once the Act was passed. Rather, as the Act provided, the Attorney General held the power of appointment, which impliedly included the power to remove the special prosecutor and supervise or review his actions. Warner and Schiebel have failed to identify any portion of the Act which diminished the Attorney General's authority to assist or control the investigation by the special prosecutor. Instead, Warner claims that a letter dated August 6, 1985 sent to special prosecutor Lawrence A. Kane, Jr., by the Attorney General removed any control the executive branch had over the special prosecutor.[10] The letter, specifically drafted to address Kane's compensation as special prosecutor pursuant to his appointment by the Attorney General, reserved the power to *terminate* the special prosecutor at any time, subject to the limitations of the March 21, 1985 appointment letter establishing his authority to complete an investigation. Although the Attorney General indicated that he would not exercise control over the office of the special prosecutor, there was no legislative mandate that he abstain. Clearly, the level of involvement by the Attorney General's office was left within the prerogative of the Attorney General and not the General Assembly. The General Assembly's involvement was limited strictly to a call for executive action. Thus, Warner's argument that the General Assembly somehow controlled the investigation by the special prosecutor is without merit. We hold that the commissioning of a special prosecutor is a constitutional exercise of legislative power when the General Assembly has conferred the powers of appointment, removal and supervision on the state Attorney General.

The second part of Warner's discussion on the violation of the separation of powers doctrine is based on the prosecutor's power to obtain sub-

---

[10] The letter provided with respect to the powers vested in the special prosecutor:

"You may assign any other attorney in the firm of Dinsmore and Shohl, under your supervision and control, and of qualifications similar to yours, to perform work in this matter. Both you and any person you assign will render services pursuant to this agreement as independent contractors. You are not to be regarded for any purpose as in the employment of or as employees of the Office of Attorney General, though it is acknowledged that you have been granted specific power associated with your appointment as Special Prosecutor which clothes you with and entitles you to the authority of a prosecutor or other authority as provided by Ohio law. It is acknowledged that for purposes of this appointment, Chapter 102 of the Ohio Revised Code is not applicable. This Office shall have no right to exercise any control over your office in exercising your judgment when discharging your professional responsibilities pursuant to this agreement.''

poenas. We reject this argument. Issuing subpoenas is a ministerial, not a judicial function. The Act mandates that the clerk of any court of common pleas, not the court itself, issue subpoenas when requested.[11] Therefore, the special prosecutor's subpoena powers did not infringe on judicial authority. Moreover, prosecutors generally have powers similar to those conferred on the special prosecutor by the Act. For example, R.C. 2939.12 requires clerks of courts to issue subpoenas for witnesses pursuant to grand jury investigations "[w]hen required by the * * * prosecuting attorney * * *." See, also, Crim. R. 17(F) (prosecuting attorneys may request the clerk of court to issue subpoenas for attendance at a hearing or trial).[12]

Warner contends that the Act divests the courts of their inherent power to prevent abuse of process. This court has stated in instances where parties were subjected to discovery abuses that the court may issue a protective order. *Jackman, supra,* at 167, 38 O.O. 2d at 409, 224 N.E. 2d at 912. Similarly, where a special prosecutor has abused the subpoena power, an injured party may seek a protective order from the court.

See *id.*[13] Absent from the record in this case is any request for a protective order regarding alleged misuse of the subpoena power by the special prosecutor. Moreover, Warner has failed to show specific instances where the special prosecutor abused the subpoena power. We are left to speculate as to what prejudice, if any, Warner may have suffered as a result of the special prosecutor's subpoena power. Warner has directed our attention to his motion to dismiss the indictment and suppress all evidence obtained directly or indirectly through the exercise of the subpoena power. Although some of the material which was the subject of the suppression motion was later introduced at trial, Warner has failed to specify how the subpoena power was misused. Therefore, Warner has not carried his burden of demonstrating reversible error.

For the reasons cited above, we overrule Warner's first proposition of law and find no error plain or otherwise.

## II
### Venue

Warner's second proposition of law asserts that the trial court erred in

---

[11] Am. S.B. No. 147, 141 Ohio Laws, Part I, 387, 388, provides with respect to the subpoena power of the special prosecutor that: "In carrying out his duties under this section, the special prosecutor shall have the power to direct the clerk of any court of common pleas within the state to issue any subpoena or similar process that the special prosecutor considers necessary or appropriate to the conduct of his investigation. A clerk of court who is directed to issue any such subpoena or similar process by the special prosecutor promptly shall issue the subpoena or similar process. * * *"

[12] In *In re Groban* (1955), 164 Ohio St. 26, 57 O.O. 70, 128 N.E. 2d 106, affirmed

(1957), 352 U.S. 330, this court by implication upheld an Ohio law which permitted state fire marshals to subpoena witnesses to testify in privately conducted investigations. For other illustrations of the use of investigatory subpoenas, see, *e.g.,* R.C. 103.17 (Legislative Service Commission); R.C. 119.09 (agencies subject to the Administrative Procedure Act); R.C. 4117.02 (H)(3) (State Employment Relations Board); R.C. 4121.15 (Bureau of Workers' Compensation).

[13] As the Act grants the special prosecutor no contempt or other enforcement powers, the special prosecutor must resort to the court for enforcement, thereby enabling challenges to his use of the subpoena.

not granting his pretrial motion for a change in venue. Specifically, Warner claims the fact that Hamilton County was saturated with "victims" of the alleged offenses coupled with the intense media coverage prevented a fair and impartial jury from being selected.

Crim. R. 18(B) provides for a change of venue where, "[u]pon the motion of any party or upon its own motion the court may transfer an action to any court having jurisdiction of the subject matter outside the county in which trial would otherwise be held, when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." See, also, R.C. 2901.12(J). However, "[a] change of venue rests largely in the discretion of the trial court, and there are numerous cases holding that appellate courts should not disturb the trial court's ruling on a motion for change of venue in a criminal case unless it is clearly shown that the trial court has abused its discretion. * * *" *State* v. *Fairbanks* (1972), 32 Ohio St. 2d 34, 37, 61 O.O. 2d 241, 243, 289 N.E. 2d 352, 355, quoted in *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 250, 15 OBR 379, 388-389, 473 N.E. 2d 768, 780. Moreover, "[i]n the absence of a clear and manifest showing by the defendant that pretrial publicity was so pervasive and prejudicial that an attempt to seat a jury would be a vain act, and in the interest of judicial economy, convenience and [reducing] expense to the taxpayer, a good faith effort should be made to impanel a jury before the trial court grants a motion for change of venue." *State* v. *Herring* (1984), 21 Ohio App. 3d 18, 21 OBR 19, 486 N.E. 2d 119, syllabus. As an appellate court, we will look to the record where the issue of venue is concerned since "[t]he examination of jurors on their *voir dire* affords the best test as to whether prejudice exists in the community

against the defendant, and where it appears that opinions as to the guilt of the defendant of those called for examination for jurors are not fixed but would yield readily to evidence, it is not error to overrule an application for a change of venue, in absence of a clear showing of an abuse of discretion." *State* v. *Swiger* (1966), 5 Ohio St. 2d 151, 34 O.O. 2d 270, 214 N.E. 2d 417, paragraph one of the syllabus, certiorari denied (1966), 385 U.S. 874, quoted in *State* v. *Coleman* (1989), 45 Ohio St. 3d 298, 302-303, 544 N.E. 2d 622, 628; *State* v. *Thompson* (1987), 33 Ohio St. 3d 1, 5, 514 N.E. 2d 407, 412; *State* v. *Maurer, supra,* at 250-251, 15 OBR at 389, 473 N.E. 2d at 781; see, also, *State* v. *Bayless* (1976), 48 Ohio St. 2d 73, 98, 2 O.O. 3d 249, 262, 357 N.E. 2d 1035, 1051, vacated in part on other grounds (1978), 438 U.S. 911 (generally, "* * * a careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality"); *In re Application of Natl. Broadcasting Co., Inc.* (C.A.D.C. 1981), 653 F. 2d 609, 617 ("*voir dire* has long been recognized as an effective method of rooting out such bias, especially when conducted in a careful and thoroughgoing manner * * *"); *United States* v. *Duncan* (C.A.4, 1979), 598 F. 2d 839, 865, certiorari denied (1979), 444 U.S. 871; *Calley* v. *Callaway* (C.A.5, 1975), 519 F. 2d 184, 209, fn. 45.

Although a criminal defendant is entitled to a fair trial by a panel of impartial jurors, there is no requirement that " '* * * the jurors be totally ignorant of the facts and issues involved' " in the case. *State* v. *Thompson, supra,* at 5, 514 N.E. 2d at 412, quoting *Irvin* v. *Dowd* (1961), 366 U.S. 717, 722. Therefore, the trial court is required to examine "the totality of the surrounding facts" and arrive at

its "own estimate of local conditions" when determining whether to change the venue in a particular case due to pretrial publicity. *Id.* at 721. It would be erroneous "[t]o hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality * * *. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. * * *" *Id.* at 723. As stated in *Reynolds* v. *United States* (1878), 98 U.S. 145, 156, the proper test to determine a juror's bias is "whether the nature and strength of the opinion formed are such as in law necessarily to raise the presumption of partiality. The question thus presented is one of mixed law and fact. * * *" Moreover, "[t]he affirmative of the issue is upon the challenger. Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside * * *." *Id.* at 157; see, also, *State* v. *Willey* (1981), 5 Ohio App. 3d 86, 89, 5 OBR 200, 202-203, 449 N.E. 2d 471, 474-475; *State* v. *Marra* (1985), 195 Conn. 421, 489 A. 2d 350 (when requesting relief, such as a change of venue or continuance, from allegedly prejudicial effects of publicity, defendant has the burden of showing that he could not receive a fair and impartial trial).

In order to dissipate the effects of adverse pretrial publicity, the judge may continue the case until the threat abates. See *State* v. *Fairbanks, supra,* at 37, 61 O.O. 2d at 244, 289 N.E. 2d at 352; *State* v. *Maurer, supra,* at 251, 15 OBR at 389, 473 N.E. 2d at 781, fn. 7. Here, the court did grant Warner's motion for a continuance, allowing over four extra months for pretrial publicity to dissipate. In fact, from the date of the indictment (December 13, 1985) to the day when voir dire began (November 17, 1986) over eleven months elapsed. "That time soothes and erases is a perfectly natural phenomenon, familiar to all. * * *" *Patton* v. *Yount* (1984), 467 U.S. 1025, 1034; *Irvin* v. *Dowd* (C.A.7, 1959), 271 F. 2d 552, 561 (Duffy, J., dissenting), reversed (1961), 366 U.S. 717 (a continuance should have been granted because "[t]he passage of time is a great healer," and public prejudice might have "subsid[ed]"); *Beck* v. *Washington* (1962), 369 U.S. 541, 556.

In a thorough review of the record, we have observed that the trial court conducted an extensive voir dire of seventy potential jurors over a two-week period. The transcript contains approximately two thousand eight hundred pages of voir dire. The trial judge summarized the potential adverse effects caused by the pretrial publicity by stating in response to the defendants' motion for a change of venue that:

"In regard to the change of venue, we have engaged in extensive and comprehensive voir dire over the last two weeks or more, subjecting some 70 jurors to one and a half to two and a quarter hours of questioning, sometimes resembling a rigorous cross-examination rather than voir dire.

"But, as a result of this procedure, several facts have become apparent. That the passage of time has reduced the effect of pretrial publicity upon this case. That the majority of the jurors questioned answered the questions posed to them truthfully, and those that were outwardly and openly biased or prejudiced were dismissed.

"The court granted several challenges for cause against jurors who seemingly complied with the fair and impartial test set up by the criminal

rules, but who demonstrated a possible prejudice.

"The jurors assembled for the general venire in this case represent what a venire in general represent[s], what the court has observed over the last eight years as a typical array of Hamilton County petit jurors.

"The jury commissioner and the court administrator's application of local rule 8(C) did not affect the jury array to the prejudice of either the defendants or the state, and that general hardship excuses are continuances, and are granted pursuant to that rule.

"All hardship excuses granted for the specific hardships created by service in this case, almost exclusively, based on the extended time of service predicted were passed upon by the court and counsel.

"Therefore, it is the considered opinion of this court that, as a result of the exhaustive draw for a fair and impartial jury panel, [one] has been found within the venue of Hamilton County, and that the defendants' motion for change of venue is overruled, please."

The trial court's postponement of its ruling on the motion for a venue change until completion of the voir dire permitted an informed conclusion by the court as to whether pre-trial publicity would prevent a "fair and impartial trial." See Crim. R. 18(B); *State v. Duerr* (1982), 8 Ohio App. 3d 404, 408, 8 OBR 526, 530-531, 457 N.E. 2d 843, 849. The trial court's actions do not reflect an attitude which was unreasonable, arbitrary or unconscionable. Therefore, there was no abuse of discretion. Accordingly, Warner's second proposition of law is overruled.

## III

### Juror Disqualification

In the state's first proposition of law and Warner's third proposition of law on cross-appeal, the issue is whether every potential juror should have been disqualified who had an account in any savings and loan institution that was temporarily closed by the Governor following the collapse of Home State. On the authority of *State v. Schiebel, supra,* at Part I of case No. 90-85, we sustain the state's first proposition of law, while overruling Warner's third proposition of law.

## IV

### Failure to Disclose

#### A

The state's proposition of law number five and Warner's proposition of law number twelve concern the necessity for an instruction on duty to disclose. Specifically, Warner claims that because the state's case was premised in part on fraudulent nondisclosure, he was entitled to a jury instruction that nondisclosure cannot be fraudulent absent a duty to disclose. As there is no dispute that an oral instruction on duty to disclose was given, Warner's proposition of law is premised only on the lack of written instructions. However, in *State v. Schiebel, supra,* at Part IIA, we reversed the court of appeals and accepted the trial court's statement, correcting the record, that written instructions on the four disputed issues, including the instruction on duty to disclose, were delivered to the jury. The premise for Warner's proposition of law twelve therefore fails, and it is overruled for that reason.

Even if the disputed written instructions had not been delivered, Warner's proposition of law twelve would be overruled for the reasons that follow.

Both Warner and Schiebel were indicted and convicted on three separate counts of securities fraud under R.C. 1707.44. Count eighty-three charged Warner and Schiebel with violating R.C. 1707.44(B)(4), which provides:

"No person shall knowingly make or cause to be made any false representation concerning a material and relevant fact, in any oral statement or in any prospectus, circular, description, application, or written statement, for any of the following purposes:

"* * *

"(4) Selling any securities in this state[.]"

In count eighty-five, both defendants were charged with violating R.C. 1707.44(J), which states:

"No person, with purpose to deceive, shall make, issue, publish, or cause to be made, issued, or published any statement or advertisement as to the value of securities, or as to alleged facts affecting the value of securities, or as to the financial condition of any issuer of securities, when such person knows that such statement or advertisement is false in any material respect."

The amended. indictment alleged with respect to counts eighty-three and eighty-five that Warner, as an agent and sole shareholder of Home State, and Schiebel, as an officer and director of the bank, knowingly made or caused to be made, false representations concerning material and relevant facts in the offering circular issued by Home State for the purpose of selling securities in the state of Ohio.[14] It further alleged that with purpose to

[14] As will be discussed, *infra*, with respect to count eighty-three, the state alleged *affirmative* misrepresentations rather than omissions. Specifically, in relation to count eighty-three, the state alleged in the indictment that there were false representations of material and relevant facts contained in the offering circular which included:

"A. The Pro Forma Consolidated Balance Sheet at June 30, 1984 contained in the Offering Circular stated that in the opinion of management, the Bank and subsidiaries had a combined total stockholders equity of $21,752,176 according to regulatory reporting methods as prescribed by the State of Ohio, when in fact the Defendants knew that the Bank and subsidiaries had a combined total stockholders equity substantially less than said amount.

"B. The Pro Forma Consolidated Balance Sheet at June 30, 1984 contained in the Offering Circular stated that in the opinion of management, the Bank and subsidiaries had a combined total stockholders equity of $3,707,463 according to generally accepted accounting principles, when in fact the defendants knew that the bank and subsidiaries had a combined total stockholders equity substantially less than said amount according to generally accepted accounting principles.

"C. The disclosures of the Bank's relationship with ESM and its affiliates, as con-tained in reports filed with the United States Securities & Exchange Commission on Form 10-K for the year ended December 31, 1983 and on Form 10-Q for the six-month period ended June 30, 1984, which Forms were incorporated by reference in the Offering Circular, were false representations of material and relevant facts in that such Forms misrepresented the extraordinary level of involvement and dependency between the Bank and its affiliates and ESM, and further misrepresented the relationship of ESM and the Bank in various repurchase and reverse repurchase transactions, and further misrepresented the substantial contingent liability and attendant risk of loss to the Bank associated with its relationship with ESM and the aforementioned transactions.

"D. The disclosures of the Bank's transactions with ESM and its affiliates, as contained in reports filed with the United States Securities & Exchange Commission on Form 10-K for the year ended December 31, 1983 and on Form 10-Q for the six-month period ended June 30, 1984, which Forms were incorporated by reference in the Offering Circular, were false representations of material and relevant facts. Such representations were false in that the Forms failed to disclose that transactions identified therein as contributing to the profitability of the Bank were in fact trans-

deceive, they made, issued, published or caused to be made, issued, or published false statements as to the financial condition of Home State as an issuer of securities.[15] These acts were alleged to have been committed when both defendants knew that such statements were false in a material respect.

The court of appeals reversed the defendants' convictions as to counts eighty-three and eighty-five, holding that written instructions concerning the duty to disclose were necessary and the trial court committed prejudicial error in failing to submit supplemental written instructions to the jury.

The state asserts that since Warner and Schiebel were charged with making only affirmative misrepresentations in violation of R.C. 1707.44(B)(4) and 1707.44(J), a duty to disclose was not an element of either offense, and that the defendants were, therefore, not entitled to have an instruction submitted to the jury on this issue.

The linchpin of Warner's argument with respect to counts eighty-three and eighty-five is that the state alleged in the indictment and bill of particulars that both defendants failed to adequately disclose relevant and material facts in the offering circular and, therefore, the state's case was premised on nondisclosure, which required a jury instruction.

Counts eighty-three and eighty-five of the amended indictment charged, in pertinent part:

"The disclosures of the Bank's transactions with ESM and its affiliates, as contained in reports filed with the United States Securities & Exchange Commission on Form 10-K for the year ended December 31, 1983 and on Form 10-Q for the six-month period ended June 30, 1984, which Forms were incorporated by reference in the Offering Circular, were false representations of material and relevant facts. Such representations were false in that the Forms failed to disclose that transactions identified therein as contributing to the profitability of the Bank were in fact transactions about which the Ohio Division of Savings & Loan Associations and the Fund had issued specific negative directives and comments and had registered serious and ongoing concerns related to the excessive and undue risk to the financial stability of the Bank created by such transactions. * * *"

The bill of particulars[16] with

---

actions about which the Ohio Division of Savings & Loan Associations and the Fund had issued specific negative directives and comments and had registered serious and ongoing concerns related to the excessive and undue risk to the financial stability of the Bank created by such transactions. Such concerns and directives were material and relevant to an adequate understanding of the financial condition of the Bank."

[15] As noted with respect to count eighty-three, count eighty-five also alleged affirmative misrepresentations in regard to the offering circular developed and distributed by the defendants. In essence,

the same conduct which violated R.C. 1707.44(B)(4) also violated R.C. 1707.44(J).

[16] A review of the record does not disclose an amended bill of particulars; however, the original bill of particulars stated the alleged misconduct by both Warner and Schiebel as to violations of R.C. 1707.44(B) and 1707.44(J). Thus, former count forty-two of the original indictment parallels count eighty-three of the amended indictment and count forty-four of the original indictment parallels count eighty-five of the amended indictment. The bill of particulars included separate, virtually identical paragraphs relating to Warner and Schiebel, respectively.

respect to counts eighty-three and eighty-five states in part:

"2. Defendant[s] Warner [and Schiebel] misrepresented the extraordinary level of involvement and dependence between Home State and its affiliates and ESM by failure to disclose the nature of the interdependence between ESM and Home State for the economic survival of each entity; the nature of the relationship between Home State, its officers and shareholders and ESM, its officers and shareholders; the nature of the relationship of ESM and Home State in various repurchase and reverse repurchase transactions; the substantial contingent liability and attendant risk of loss to Home State associated with its relationship with ESM and the aforementioned transactions, about which defendant[s] Warner [and Schiebel] had actual knowledge based upon * * * [their] understanding of the financial condition of ESM; and the mischaracterization of the transactions with ESM which had been declared unsafe and unsound by appropriate regulatory authorities who had directed that the transactions between Home State and ESM be reduced or eliminated.

"3. Defendant[s] Warner [and Schiebel] misrepresented the relationship of ESM and Home State in various repurchase and reverse repurchase transactions by failure to adequately disclose: (1) the nature of ESM as a principal in the various repurchase and reverse repurchase transactions; and (2) the substantial financial exposure of Home State in these transactions known to defendant[s] Warner [and Schiebel] by virtue of * * * [their] understanding of ESM's financial condition; and (3) the regulatory challenges to the transactions by the State of Ohio and officials of the Ohio Deposit Guarantee Fund, including directives that the transactions should be substantially reduced or eliminated.

"4. Defendant[s] Warner [and Schiebel] misrepresented the substantial contingent liability and attendant risk of loss to Home State associated with its relationship with ESM and the aforementioned transactions by failure to disclose Home State's inability to unwind its transactions with ESM due to ESM's financial condition and Home State's reliance on income from ESM's investments in order to survive and continue its daily operations.

"5. Defendant[s] Warner [and Schiebel] made or caused to be made false representations in the Offering Circular by supervising, directing, and assisting and aiding in the preparation of the Offering Circular. Defendant[s] Warner's [and Schiebel's] participation in the preparation of the Offering Circular included * * * [their] participation in conversations and meetings with Home State's employees in which the format and contents of the Offering Circular and its transmittal letter were discussed and determined. Defendant[s] Warner [and Schiebel] also directed Home State employees in * * * [their] duties in connection with the Offering Circular and instructed them concerning changes in the Offering Circular and its transmittal letter."

Clearly, the portions of the amended indictment and bill of particulars which discuss Warner's and Schiebel's failure to disclose certain material facts only illustrate the defendants' conduct in making *affirmative misrepresentations* in the offering circular. The thrust of the state's case as to counts eighty-three and eighty-five was that the defendants represented to potential debenture purchasers that Home State dealt with ESM at arm's length, that ESM's margin calls on Home State were directly related to market forces, that Home State's suc-

cess in day trades was the result of management's success in calculating the market, and that ESM was merely an agent in the repurchase transactions. Moreover, the state presented evidence that showed the defendants falsely represented unaudited financial statements in the offering circular to be an accurate financial account of Home State. Altogether, the affirmative misrepresentations by the defendants far outweighed any elements of nondisclosure. Obviously, when a party has made affirmative misrepresentations there will invariably also be items he has left undisclosed.

Thus, in reviewing the amended indictment and bill of particulars, we find that the state's case against Warner and Schiebel was based primarily on affirmative misrepresentations rather than nondisclosure.

Even assuming, *arguendo,* that the state's case was premised on the defendants' failure to disclose relevant and material information, R.C. 1707.44(B)(4) and 1707.44(J) would not require an instruction on duty to disclose. Neither R.C. 1707.44(B)(4) nor 1707.44(J) includes among possible violations the omission or nondisclosure of material facts. Instead, R.C. 1707.44(B) states that a defendant commits a violation when he or she "* * * knowingly make[s] or cause[s] to be made any false representation[s] * * *." Similarly, R.C. 1707.44(J) is triggered when a defendant has "* * * with purpose to deceive, * * * [made], issue[d], publish[ed], or cause[d] to be made, issued, or published any statement or advertisement as to the value of securities or as to alleged facts affecting the value of securities * * *." There is no language within either section which indicates that a defendant could be charged with omissions rather than affirmative misrepresentations. R.C. 1707.44(B)(4) and (J) prohibit only

affirmative misrepresentation; they do not apply to fraudulent nondisclosure.

The elements of a crime must be gathered wholly from the statute. *State* v. *Cimpritz* (1953), 158 Ohio St. 490, 49 O.O. 418, 110 N.E. 2d 416, paragraph two of the syllabus; *Davis* v. *State* (1877), 32 Ohio St. 24, 28. Therefore, we must presume that if the General Assembly intended that a party be held accountable for a failure to disclose under R.C. 1707.44(B)(4) or 1707.44(J), it would have included the appropriate language in the statute. See, *e.g.,* R.C. 1707.44(D) ("No person who is an officer, director, or trustee of, or a dealer for, any issuer, and who knows such issuer to be insolvent in that the liabilities of such issuer exceed its assets, shall sell any securities of or for any such issuer, *without disclosing the fact* of such insolvency to the purchaser" [emphasis added]); Section 240.10b-5(b), Title 17, C.F.R. (which is similar to R.C. 1707.07[B] and 1707.07[J] and which provides that it shall be unlawful in a securities transaction "[t]o make any untrue statement of a material fact or to *omit* to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" [Emphasis added.]).

B

The state also contends in its fifth proposition of law that a written instruction on duty to disclose was not necessary pursuant to R.C. 1707.44 (G), a violation of which was charged in count eighty-six, since only affirmative misrepresentations were averred at trial rather than defendants' failure to disclose material and relevant facts.

R.C. 1707.44(G) provides: "No person in selling securities shall knowingly engage in any act or practice which is, in sections 1707.01 to 1707.45

of the Revised Code, declared illegal, defined as fraudulent, or prohibited." The definition of "fraud" in R.C. 1707.01(J), states: " 'Fraud,' 'fraudulent acts,' 'fraudulent practices,' or 'fraudulent transactions' means anything recognized on or after July 22, 1929, as such in courts of law or equity; any device, scheme, or artifice to defraud or to obtain money or property by means of any false pretense, representation, or promise; any fictitious or pretended purchase or sale of securities; and any act, practice, transaction, or course of business relating to the sale of securities which is fraudulent or which has operated or would operate as a fraud upon the purchaser."[17] Taking this definition into account we shall inquire as to the scope of the duty to disclose where fraud is alleged. In Ohio, a duty to disclose was first recognized in the case of *Miles* v. *McSwegin* (1979), 58 Ohio St. 2d 97, 99, 12 O.O. 3d 108, 110, 388 N.E. 2d 1367, 1369. In *Miles,* prospective home buyers brought an action against a real estate broker and a savings and loan company alleging that the defendants concealed the presence of termites on the premises. The court held that "[o]ne of the interests protected by the law of deceit is 'the interest in formulating business judgments without being misled by others * * *' into making unwise decisions which result in finan-

cial loss. * * * It is well established that an action for fraud and deceit is maintainable not only as a result of affirmative misrepresentations, but also for negative ones, such as the failure of a party to a transaction to fully disclose facts of a material nature where there exists a duty to speak." (Citations omitted.) *Id.* See, also, Prosser & Keeton, The Law of Torts (5 Ed. 1984) 738-739, Representation and Nondisclosure, Section 106; 37 American Jurisprudence 2d (1968) 196-201, Fraud and Deceit, Sections 144 and 145; *First Natl. Bank of Toledo* v. *Stewart Petroleum & Drilling Corp.* (Aug. 17, 1984), Lucas Cty. App. No. L-84-017, unreported.

In *Chiarella* v. *United States* (1980), 445 U.S. 222, the United States Supreme Court discussed the possible situations where a duty to disclose arises. The *Chiarella* court construed Section 10(b) of the Securities Exchange Act of 1934, Section 78j, Title 15, U.S. Code, in an instance where a financial printer, who was engaged by certain corporations to print corporate takeover bids, deduced the names of the target companies from documents delivered to the printer by the acquiring companies and, without disclosing his knowledge, purchased stock in the target companies and sold it immediately after the takeover attempts were made public. *Id.* at 224-225. In

---

[17] Ohio courts have recognized fraud to include: (1) representation, or where there is a duty to disclose, concealment, of a matter of fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately

caused by the reliance. *Gaines* v. *Preterm-Cleveland, Inc.* (1987), 33 Ohio St. 3d 54, 55, 514 N.E. 2d 709, 712; *Burr* v. *Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St. 3d 69, 23 OBR 200, 491 N.E. 2d 1101, paragraph two of the syllabus; *Cohen* v. *Lamko, Inc.* (1984), 10 Ohio St. 3d 167, 10 OBR 500, 462 N.E. 2d 407; *Moore* v. *Fenex, Inc.* (C.A.6, 1987), 809 F. 2d 297, 301; *Dunn Appraisal Co.* v. *Honeywell Information Systems, Inc.* (C.A.6, 1982), 687 F. 2d 877, 882.

holding that the defendant was not under a duty to disclose, the *Chiarella* court explained:

"* * * [O]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.' * * *" (Footnote omitted.) *Id.* at 228.

Furthermore, the court noted that "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak. * * *" *Id.* at 235.

There is some question as to whether an allegation of fraud requires an instruction on duty to disclose. In *Miles* v. *McSwegin, supra,* this court held that "* * * a party is under a duty to speak, and therefore liable for non-disclosure, if the party fails to exercise reasonable care to disclose a material fact which may justifiably induce another party to act or refrain from acting, and the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading. * * *" *Id.* at 100, 12 O.O. 3d at 110, 388 N.E. 2d at 1369, citing 3 Restatement of the Law 2d, Torts (1965) 119, Sections 55(1) and (2).

Therefore, since nondisclosure can be a fraudulent act under Ohio law, we hold that R.C. 1707.44(G) prohibits not only affirmative misrepresentation, but also fraudulent nondisclosure where there is a duty to disclose. However, a defendant is not entitled to a jury instruction on nondisclosure and duty to disclose unless the state's case is premised on nondisclosure.

In the case *sub judice,* the thrust of count eighty-six of the amended indictment does not rely upon non-disclosures by Warner.[18] Instead, it

---

[18] Count eighty-six of the amended indictment, as to Warner and Schiebel, provides, in pertinent part:

"(7) The Defendants

"MARVIN L. WARNER, and

"DAVID J. SCHIEBEL,

"Commencing on or about June 1, 1984 and extending through November, 1984 at the County of Hamilton, State of Ohio, in violation of Section 1707.44(G) of the Ohio Revised Code, did, in selling securities of the Bank offered by means of the Offering Circular, knowingly engage in acts or practices which were declared illegal, defined as fraudulent or prohibited in Sections 1707.01 to 1707.45 of the Revised Code, a fourth degree felony, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Ohio.

"(8) The Defendants knowingly engaged in acts or practices which were defined as fraudulent in Section 1701.01 of the Ohio Revised Code in that the Defen-dants obtained the property of purchasers of the Bank's securities by means of false representations contained in the Offering Circular. The Defendants did prepare, review, revise, supervise, direct, assist and aid in the preparation of the Offering Circular which contained misrepresentations of material and relevant facts, and did assist, supervise, direct, and aid in the sale of the securities offered by means of the Offering Circular. The use of the Offering Circular and the misrepresentations contained therein constituted an act, practice, or course of business relating to the sale of securities which was fraudulent and which operated as a fraud upon the purchasers in that the purchasers were not provided with information material and relevant to an adequate understanding of the financial condition of the Bank and to an evaluation of their investment in the Bank's securities.

"(9) Defendant DAVID J. SCHIE-BEL did knowingly engage in acts or practices which are defined as fraudulent in Sec-

alleged that Warner had engaged in fraudulent practices by preparing an offering circular which misrepresented material and relevant facts, and did assist, supervise, direct, and aid in the sale of the securities offered by the offering circular. Essentially, the bill of particulars restates count eighty-six in the amended indictment. In describing Warner's actions, the bill of particulars states in pertinent part:

"* * * His conduct arises from his approving the Offering Circular which contained misrepresentations concerning Home State's relationship with ESM as * * * [discussed in the indictment], and overvaluation of Home State's assets on the financial statement set forth in the Offering Circular, including overvaluation of such items as loans and receivables and real estate."

Obviously, the failure of Warner to disclose the financial condition of Home State was incidental to the affirmative misrepresentation of Home State's status alleged in the amended indictment and the bill of particulars. Taken as a whole, the bill of particulars alleges only that Warner committed fraud by affirmative misrepresentations rather than by failing to disclose.

Thus, it can be seen from the allegations contained in the amended indictment and bill of particulars that any instruction regarding Warner's duty to disclose material and relevant information would have been error. Consequently, the trial court erred in giving the following oral instruction to the jury regarding the duty to disclose:

"In counts 83, 85, and 86, in regard to — fraudulent misrepresentation is when an allegation of fraud is based upon no disclosure. There can be no fraud absent a duty to speak by one charged of engaging in the fraud."

As stated in our previous discus-

---

tion 1701.01 of the Ohio Revised Code in that Defendant DAVID J. SCHIEBEL did obtain the Superintendent's and Fund's approval of the Merger by means of false disclosures and misrepresentations to the Fund and to the Superintendent concerning the existence or status of Registration Statement No. 2-88983 (the 'Registration Statement') then on file with the United States Securities & Exchange Commission and the difficulties encountered therewith. Defendant DAVID J. SCHIEBEL did obscure information with respect to the existence and status of the Registration Statement for the express purpose of obtaining approval of the Merger, which Merger (i) allowed the debentures identified in paragraph (2) of this Count Eighty-Six to become the direct obligations of the Bank, in circumvention of the Fund's restrictions on the payment of dividends by the Bank to its parent, thereby making the liquidity of the Bank available to pay amounts due on the debentures; (ii) avoided the necessity of further pursuit of the Registration Statement with federal and state authorities as a condition to the issue of the Bank of new debentures; (iii) allowed the issuance of debentures without registration and disclosure of information required in registration with the United States Securities & Exchange Commission and the Ohio Division of Securities. The foregoing actions by Defendant DAVID J. SCHIEBEL constituted a scheme, acts or a course of business which related to the sale of securities offered by means of the Offering Circular, which was fraudulent and which operated as a fraud upon the purchasers of the Bank's securities in that the purchasers were not provided with information material and relevant to an adequate understanding of the financial condition of the Bank and to an evaluation of their investment in the Bank's securities.

"(10) The Defendants MARVIN L. WARNER, and DAVID J. SCHIEBEL in selling securities of the Bank offered by means of the Offering Circular, knowingly engaged in acts or practices which were declared illegal or prohibited in Sections 1707.44(B) * * * of the Revised Code, as described more fully in * * * [Count] Eighty-Three * * * of this Indictment."

sion, any instruction on the duty to disclose, oral or written, would have been improper in this case; therefore, the trial court erred in giving the above instruction to the jury. Accordingly, we must determine whether such error was prejudicial to the defendant.

In *State* v. *Price* (1979), 60 Ohio St. 2d 136, 14 O.O. 3d 379, 398 N.E. 2d 772, paragraph four of the syllabus, we held that: "A single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge. (*Cupp* v. *Naughten,* 414 U.S. 141, 147, followed.)" See, also, *Vargo* v. *Travelers Ins. Co.* (1987), 34 Ohio St. 3d 27, 31, 516 N.E. 2d 226, 230; *State* v. *Coleman, supra,* at 290, 525 N.E. 2d at 797; cf. *Lakes* v. *Ford* (C.A.11, 1986), 779 F. 2d 1578; *Francis* v. *Franklin* (1985), 471 U.S. 307. Upon review of the entire set of instructions given to the jury, it is clear that the jury was not instructed as to Warner's duty to disclose material and relevant facts in the main but, rather, it was instructed to decide whether defendant made affirmative misrepresentations as to Home State's status. Even if we were to assume that the jury was instructed that it had to determine whether defendant was under a duty to disclose, this would not have been prejudicial to the defense. As noted in our previous discussion, the defense was not entitled to such an instruction. Therefore, any oral instruction on this issue was prejudicial to the state and not to the defense. And, since the defendant was not entitled to the instruction in the first place, there would have been no prejudice even if this part of the instructions was not reduced to writing.

Accordingly, the state's fifth proposition of law is sustained, while Warner's twelfth proposition of law is overruled.

## V
## Culpable Mental State under R.C. 1707.29 as Applied to R.C. 1707.44

In Warner's thirteenth proposition of law, defendant argues that R.C. 1707.29 creates a mandatory presumption of knowledge which violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. He alleges two errors in this vein. First, he claims that R.C. 1707.29 establishes a presumption of knowledge which relieves the state of its burden of proof on that essential element of its case against him. Second, he claims that the trial court improperly instructed the jury that under R.C. 1707.29 defendant could be presumed to have knowledge of certain facts. For the reasons that follow, we find this argument to be without merit.

Warner was convicted of three securities violations under R.C. 1707.44. All three counts contained the element of knowledge. In any prosecution brought under R.C. 1707.01 through 1707.45 (which included the counts against Warner), R.C. 1707.29 provides that "the accused shall be deemed to have had knowledge of any matter of fact, where in the exercise of reasonable diligence, he should, prior to the alleged commission of the offense in question, have secured such knowledge."

In construing the language contained in R.C. 1707.29, the court in *State* v. *Walsh* (1979), 66 Ohio App. 2d 85, 95-96, 20 O.O. 3d 178, 184-185, 420 N.E. 2d 1013, 1020, held that "* * * although R.C. 1707.44(G) utilizes the word 'knowingly,' R.C. 1707.29 has the general effect of defining 'knowingly' more in terms of 'negligently' as defined by R.C. 2901.22(D), rather than 'knowingly' as defined by R.C. 2901.22(B). Thus, for the purpose of fraudulent acts in selling securities in violation of R.C. 1707.44(G), a person

is criminally liable if he represents facts to be different than he should have known them to be if he had exercised reasonable diligence to ascertain the facts. On the other hand, of necessity, a good-faith belief in the existence of the fact as represented creates no criminal liability, since one cannot have a good-faith belief in facts which he should know to be otherwise had he exercised reasonable diligence. Good faith necessarily implies the exercise of reasonable diligence to ascertain the true state of facts.

"There remains, however, a very important issue for the jury to determine, *i.e.,* whether the defendant should have learned the true nature of the facts in the exercise of reasonable diligence. First, it must be ascertained whether defendant exercised reasonable diligence to ascertain the true state of facts; and, second, it must be determined whether he should, not merely could, have learned of the true facts in the exercise of reasonable diligence. This is not a situation where one fact is presumed to exist because of the existence of another; but, instead, in the context of this case, the jury is required to make a factual determination of whether the defendant represented the facts to be different than he should have known them to be, in the exercise of reasonable diligence. This in no way infringes upon the presumption of innocence, since the state is required to prove, beyond a reasonable doubt, that the defendant in the exercise of reasonable diligence should have known the facts to be different than he represented them to be. Actually, there is little difference between this standard and the standard that is ordinarily used, since it is permissible to infer that a defendant has knowledge of facts which he should have known under the circumstances involved. * * *"

We are persuaded by the *Walsh* rationale which interprets the legislative intent of R.C. 1707.29 to, in effect, define the knowledge requirement for certain violations of Ohio's Securities Act, R.C. Chapter 1707. Thus, instead of creating a presumption as alleged by Warner, R.C. 1707.29 merely sets forth what the term "knowledge" encompasses for purposes of criminal liability under R.C. Chapter 1707. Therefore, we hold that under R.C. 1707.44 (B)(4), (G), and (J), a person is criminally liable if he represents facts to be different than he should have known them to be if he had exercised reasonable diligence to ascertain the facts prior to the commission of the offense.

In the case *sub judice,* after reciting R.C. 1707.29, the trial court instructed the jury as follows:

"The following is an explanation of the application of Section 1707.29. You as the jury must determine whether or not the defendant or the defendants should have learned the true nature of the facts represented by them in conjunction with the sale of securities in the exercise of reasonable diligence.

"First, it must be ascertained whether the defendant or defendants exercised reasonable diligence to determine the true state of facts; and, second, it must be determined whether he or they should, not merely could, have learned of the true facts in the exercise of reasonable diligence. It is your duty to determine if the defendant or the defendants represented the facts to be different than he or they should have known them to be in the exercise of reasonable diligence.

"Reasonable diligence is due diligence of a character exercised by a fair and ordinarily prudent person under the same or similar circumstances.

"In other words, a defendant or the defendants knew of the existence of material and relevant facts if, by the

exercise of reasonable diligence, he or they should have known of their existence.

"Thus, for the purposes of an application of 1707.29 to the 1707.01 to 1707.45 alleged violations, a person is criminally liable if he represents facts to be differerent [*sic*] than he should have known them to be if he had exercised reasonable diligence to ascertain the facts.

"On the other hand of necessity, a good faith belief in facts which he should know to be otherwise had he exercised reasonable diligence to ascertain the true state of facts. [*Sic.*]

"A false representation, a false representation is a representation which is untrue, knowingly made to deceive another, a representation of what is true, which nevertheless — or it should be a representation of what is true, which nevertheless creates an impression of that which is false.

"A false representation may arise from any conduct capable of being turned into a statement of fact by a person of ordinary prudence. Thus, a false representation may be made by conduct calculated and intended to produce a false impression as well as by words.

"Such conduct may include the manner in which material facts were presented. If you find the offering circular involved conduct calculated to and amounting to a false representation intended to deceive purchasers of the debentures, such false representation could be the basis for a finding of guilty."

Accordingly, the trial court properly instructed the jury on the requisite culpable mental state for purposes of violating R.C. 1707.44(B)(4), (G), and (J).

If we were to accept Warner's contention that the jury instructions on R.C. 1707.29 were erroneous, we would still need to determine whether such instructions were harmless error. See *Carella* v. *California* (1989), 491 U.S. ___, 105 L. Ed. 2d 218, 222, 109 S. Ct. 2419, 2421 (" 'In many cases, the predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not *intend* to cause injury . . . . In that event the erroneous instruction is simply superfluous: the jury has found, in *Winship*'s words, "every fact necessary" to establish every element of the offense beyond a reasonable doubt' "), citing *Rose* v. *Clark* (1986), 478 U.S. 570, 580-581. After reviewing the instructions, we hold that even if the trial court shifted the burden from the prosecution on an essential element of the case, the error was harmless beyond a reasonable doubt because the predicate facts conclusively established knowledge on the part of Warner, so that no rational juror could find that Warner made the misrepresentations without the knowledge required by R.C. 1707.44. As noted in our recitation of the facts, Warner was involved in almost every facet of the internal operations of the bank. He was kept informed of all policy decisions by the board of directors. Warner's actions were shown to be calculated and deceitful. Therefore, any claim that Warner committed the act without the requisite knowledge is unsupported.

Therefore, for the foregoing reasons, we overrule Warner's thirteenth proposition of law.

## VI
### App. R. 9(E)
### Correction of the Record

In the state's fourth and sixth propositions of law and Warner's ninth, tenth, eleventh and fourteenth propositions of law, the issues concern the procedure for giving certain in-

structions to the jury, whether a supplemental record of the instructions was properly made, the trial court's refusal to show the written jury instructions to defense counsel prior to their submission to the jury,[19] and the constable's *ex parte* communications with the jury. We note with respect to the *ex parte* communications that Warner's attorneys were present when the trial judge left his chambers to order the additional instructions given to the jury. Warner does not assert, nor does the record indicate, that he objected to the trial court about this procedure or that a request was made that the jury be recalled for a formal presentation of the additional written instructions in open court. For the reasons stated in *State* v. *Schiebel, supra,* at Part II of case No. 90-85, we sustain all of the state's propositions of law and overrule Warner's propositions of law on this issue.

## VII
### Jury Instructions

In Warner's tenth proposition of law, he argues that there were variations between the oral instructions and the written instructions.

In Part IV of this opinion, we found that there was no requirement to give an instruction on the duty to disclose based on the charges for violating R.C. 1707.44(B), (G), or (J). Therefore, if such a written instruction did not make its way to the jury, no error occurred. If the instruction did go to the jury, it would have benefited the defense and been harmful to the prosecution.

Furthermore, we have reviewed Warner's other claims regarding alleged variations and find them to be meritless.

Accordingly, for the above-stated reasons and those expressed on this issue in *State* v. *Schiebel, supra,* at Part IV of the cross-appeal in case No. 90-85, Warner's tenth proposition of law is not well-taken.

## VIII
### Fedwire Transfers

In the state's third proposition of law and Warner's proposition of law eight, the issue is whether an unauthorized transfer of a savings and loan association's assets through the Fedwire[20] system constitutes the

---

[19] We find no prejudice from Warner's inability to review the trial court's written instruction on motive to the effect that a good motive or "purpose" was no defense to the crime of unauthorized acts or willful misapplication of funds. We agree with the court of appeals' conclusion that only with respect to the offense of willful misapplication was the jury instructed both that purpose is an element of the offense and that a good purpose was not a defense. Thus, the jury was adequately instructed as to the elements and defenses of both crimes. However, we note that there is no need for an instruction on good motive not being a defense to unauthorized acts, since the statute only requires a culpable mental state of recklessness.

Therefore, given Warner's acquittal on all the counts alleging willful misapplication of funds, we find no prejudicial error and overrule Warner's ninth and tenth propositions of law as they relate to this issue.

[20] The Federal Reserve System ("Fed") provides a mechanism, called Fedwire, for transferring funds without using paper checks. Through the use of telephonic communications, computer processing, and other technological advances, the system can quickly transfer funds in large amounts across the country. All such transfers are completed on the same day, usually in a matter of minutes, and are guaranteed final when the receiving institution is notified of the credit to its account. Fedwire may be

assignment, transfer or delivery of a draft or other written instrument pursuant to R.C. 1153.01.

The state contends that between the months of May and October 1983, Warner caused a total of $114,000,000 of Home State's assets to be transferred on forty-one separate occasions, all of which violated Home State's board of directors' resolution dated April 28, 1983. All these funds were paid over the Fedwire system. R.C. 1153.01 provides:

"No president, director, trustee, committee member, secretary, treasurer, attorney, or other officer or agent of a building and loan association shall embezzle, abstract, or willfully misapply any of the moneys, funds, or credits of the association; nor shall he issue or put into circulation a warrant or other order, or assign, transfer, cancel, or deliver a note, bond, draft, mortgage, judgment, decree or other written instrument belonging to the association, or raise or receive money

---

used by depository institutions to transfer funds from their own account that result from purchases or sales of federal funds, to meet balances at correspondent banks, and to send funds to another institution on behalf of customers. Transfers on behalf of customers include funds associated with the purchase or sale of securities, the replenishment of business demand deposits, and other time-sensitive payments. The Treasury Department and other federal agencies use Fedwire extensively to disburse and collect funds. The average transaction exceeds one million dollars, and the service handles billions of dollars in transactions each day. Its use has increased as a result of business customers seeking close control and management of their funds. Users can make transfers either by telephone or through on-line computer linkups. For example, in 1986 the number of funds transfers increased by 10.6 percent over the prior year for a total of 49,900,000 transactions. 73 Bd. of Governors, Fed. Reserve Sys. Annual Rep. 210 (1987); Schroeder, Bank Officer's Handbook of Commercial Banking Law (6 Ed. 1989) 3-36 to 3-37, Section 3.04[5][b].

Unlike the telex, for example, which only transmits the instruction to pay, a Fedwire transmits both the message and the underlying funds. Thus, the Fed participates directly in the settlement of interbank obligations and provides settlement services as well as communication services.

Currently, the rules governing the Fedwire are contained in Subpart B of Regulation J contained in Sections 210.25 to 210.38, Title 12, C.F.R., issued by the

Board of Governors of the Federal Reserve System as supplemented by operating circulars issued by each Federal Reserve Bank.

Settlement in Fedwire is bilateral. The Fed debits and credits Fed accounts on each separate message moving through the system. While the Fed permits some senders of Fedwires to overdraw their accounts during the day, the finality of a Fedwire payment is not conditional on the sender's covering the "daylight" overdraft. Regulation J provides that a transfer is "finally paid" when "the transferee's Reserve Bank sends the transfer item or telephones the advice of credit for the item to the transferee, whichever occurs first. Section 210.36(a), Title 12, C.F.R. Since the credit to the recipient depository institution's account is not conditional and occurs almost simultaneously with the receipt of the transfer instruction by the Fed, and because it is practically impossible for a Reserve Bank to fail, Fedwire credits are "good funds." Indeed, they are the best funds a transferee can have. Scott, Corporate Wire Transfers and the Uniform New Payments Code (1983), 83 Colum. L. Rev. 1664, 1669-1670.

Although the number of wire transfers each year is quite small in relation to checks (one to two hundred thirty-five), when something goes wrong on a wire transfer, a great deal more money (a ratio of $3,500 to $1) is typically at stake. Almost all transfers are settled through a reserve account at the Federal Reserve Bank. See Vergari & Shue, Checks, Payments, and Electronic Banking (1986) 524, fn. 33.

for and in the name of such association, unless authorized to do so by its board of directors."

The indictment, however, charged only that Warner did "assign, transfer or deliver a note, bond, draft or other written instrument"; it did not charge with the statutory language that he did "issue or put into circulation a warrant or other order."

Thus, the issue before this court is whether these Fedwire transfers violated that part of R.C. 1153.01 charged in the indictment. Warner asserts that a wire transfer is not a "written instrument" within the meaning of R.C. 1153.01, as it is neither "written" nor an "instrument" as those words are commonly used.

Since this issue is one of first impression for this court, we will consider how other jurisdictions have applied laws drafted primarily to address traditional written documents, such as checks, but applied to modern wire transfers. In *Richards* v. *Platte Valley Bank* (C.A.10, 1989), 866 F. 2d 1576, the United States Court of Appeals decided that the word "check" as used in the Uniform Fiduciaries Act could be interpreted to include wire transfers of funds. The *Richards* court stated:

"We believe wire transfers are analogous to checks for application of the Uniform Fiduciaries Act. The transfer of funds by cable or telegraph is in law a check. *Lourie* v. *Chase Nat'l Bank,* 42 N.Y.S. 2d 205, 206 (Sup. Ct. 1943). See also *Delbrueck & Co.* v. *Manufacturers Hanover Trust Co.,* 609 F. 2d 1047, 1051 (2d Cir. 1979) (wire transfers have been treated as analogous to checks in determining whether a transfer is irrevocable). * * *

"* * *

"* * * The transfer item must be in some form of writing, such as letter, telegram or magnetic disc. 12 C.F.R. § 210.28. Wire transfers are considered irrevocable after transmission. *Delbrueck,* 609 F. 2d at 1051.

"The wire transfer requirements [see Sections 210.25 to 210.38, Title 12, C.F.R.] are similar to the definition of a check under the Uniform Commercial Code. A check is defined as a draft drawn upon a bank and payable on demand, signed by the maker or drawer, containing an unconditional promise to pay a sum certain in money to the order of the payee. * * * A wire transfer is a written order to pay, drawn upon a bank containing an unconditional promise to pay a sum certain in money to the order of the beneficiary. The only element missing is the maker's signature. We do not consider this element significant for purposes of excluding wire transfers from the operation of the Uniform Fiduciaries Act." *Id.* at 1580-1581.

Although the Uniform Commercial Code is not directly applicable to this case due to the nature of the transfer, analogous use of its concepts supports the proposition that wire transfers are written instruments for purposes of R.C. 1153.01. *Delbrueck & Co.* v. *Mfrs. Hanover Trust Co.* (C.A.2, 1979), 609 F. 2d 1047, 1051 ("[t]he Uniform Commercial Code ['UCC'] is not applicable to this case because the UCC does not specifically address the problems of electronic funds transfer. However, analogous use of concepts such as the finality of checks once 'accepted' (§§ 3-410, 4-303) would support the irrevocability of these transfers"); *Securities Fund Services* v. *Am. Natl. Bank & Trust Co.* (N.D. Ill. 1982), 542 F. Supp. 323, 326-328; cf. *Evra Corp.* v. *Swiss Bank Corp.* (C.A.7, 1982), 673 F. 2d 951, 955 ("[m]aybe the language of Article 4 [of the Uniform Commercial Code] could be stretched to include electronic fund transfers, see section 4-102(2), but they were not in the contemplation of the draftsmen.").

In *Illinois, ex rel. Lignoul,* v. *Continental Ill. Natl. Bank & Trust Co. of Chicago* (C.A.7, 1976), 536 F. 2d 176, certiorari denied (1976), 429 U.S. 871, the United States Court of Appeals, Seventh Circuit, decided that making an electronic transfer of funds through a computer terminal was essentially the same as issuing a check. The *Lignoul* court observed:

"The check is merely the means used by the bank to attain the desired objective, *i.e.,* the payment of the money to its customer. The card serves the same purpose as the check. It is an order on the bank. Any order to pay which is properly executed by a customer, whether it be check, card or electronic device, must be recognized as a routine banking function when used as here. The relationship between the bank and its customer is the same. Indeed, the trial court here recognized this when it characterized a CBCT [Customer Banking Communication Terminal] withdrawal as the 'functional equivalent' of a written check. * * *

"* * *

"* * * There are many ways in which an order may be given and one way of late is by computer record. *Transport Indemnity Co.* v. *Sieb,* 178 Neb. 253, 132 N.W. 2d 871 (1965). And the Ninth Circuit accepts the same concept that computer impulses constitute sufficient writing to meet the order test. *United States* v. *DeGeorgia,* 9 Cir., 420 F. 2d 889 (1969)." *Id.* at 178; see, generally, Clarke, An Item Is An Item Is An Item: Article 4 of the UCC and the Electronic Age (1969), 25 Bus. Law. 109, 112.

In reviewing federal regulations on this issue, we note that the reporting requirements for financial institutions recognize that a wire transfer falls within the general category of a written instrument. Specifically, in Section 103.11(p), Title 31, C.F.R., a "transaction in currency" is described as:

"A transaction involving the physical transfer of currency from one person to another. A transaction which is a transfer of funds by means of bank check, bank draft, wire transfer, or other written order, and which does not include the physical transfer of currency is not a transaction in currency within the meaning of this part."

In turning to the case *sub judice,* we begin with the general rule of statutory construction that criminal statutes should be strictly construed against the state in criminal prosecutions. R.C. 2901.04(A). However, we are mindful that "[t]he canon in favor of strict construction of criminal statutes is not an obstinate rule which overrides common sense and evident statutory purpose. The canon is satisfied if the statutory language is given fair meaning in accord with the manifest intent of the General Assembly. *United States* v. *Moore* (1975), 423 U.S. 122, 145; *United States* v. *Brown* (1948), 333 U.S. 18, 25-26." *State* v. *Sway* (1984), 15 Ohio St. 3d 112, 116, 15 OBR 265, 268, 472 N.E. 2d 1065, 1068. Thus, the rule of *ejusdem generis* should not be invoked to defeat the obvious purpose of a legislative enactment.

In today's modern banking environment, electronic transfers have become commonplace.[21] On an average

---

[21] As noted in the Official Comments to UCC 4A-102:

"* * * The funds transfer governed by Article 4A is in large part a product of recent and developing technological changes. Before this Article was drafted there was no comprehensive body of law — statutory or judicial — that defined the juridical nature of a funds transfer or the rights and obligations flowing from payment orders. Judicial authority with respect to funds transfers is sparse, undeveloped and not

day, six hundred billion dollars in funds are transferred by wire or electronic means. Vergari & Shue, Checks, Payments and Electronic Banking (1986) 529. This vastly exceeds the amount transferred by check. See Scott, Corporate Wire Transfers and the Uniform New Payments Code (1983), 83 Colum. L. Rev. 1664. As noted in the discussion above, under modern day conditions, transferring assets of a savings and loan association over the Fedwire is the equivalent of sending a check or issuing a draft.

Through R.C. 1153.01, the General Assembly clearly intended to criminalize the unauthorized transfers of an association's assets regardless of form. Thus, the transfer of funds through the Fedwire system qualifies as a "draft" or other "written instrument" as those terms are used in R.C. 1153.01. Accordingly, the court of appeals' conclusion that the unauthorized transfer of Home State's assets over the Fedwire did not constitute a "writing" within the meaning of R.C. 1153.01 was erroneous.

Therefore, for the reasons cited in the above analysis, the state's third proposition of law is sustained, and Warner's seventh proposition of law is overruled.

## IX

### Culpable Mental State Under R.C. 1153.01

In his fourth proposition of law, Warner asserts that the trial court failed to properly instruct the jury that

in order to find Warner in violation of R.C. 1153.01, it would have to determine that he intended to injure or defraud Home State.

R.C. 1153.01 does not on its face provide the degree of culpability necessary in order to be found guilty of unauthorized acts, nor does it plainly indicate a purpose to impose strict liability. Although a "willful" or "purposeful" state of mind could arguably be an element of a charge of willful misapplication of funds under the first clause of R.C. 1153.01, there is no way to construe the second clause of the statute to impose such a requirement for conviction for unauthorized acts. Thus, we must determine what mental state is necessary for a conviction under the second clause.

As a general rule of construction, "[a] statute defining an offense, which is silent on the question of intent, thereby indicates the purpose of the General Assembly to make proof of a specific intent unnecessary, and, therefore, proof of a general intent to do the proscribed act is sufficient[.] * * *" *State* v. *Lisbon Sales Book Co.* (1964), 176 Ohio St. 482, 27 O.O. 2d 443, 200 N.E. 2d 590, paragraph two of the syllabus; see, also, *State* v. *Bentz* (1981), 2 Ohio App. 3d 352, 353, 2 OBR 408, 409, 442 N.E. 2d 90, 92. Furthermore, R.C. 2901.21(B) sets forth the requirements for criminal liability by providing in part: "* * * When the section neither specifies culpability nor plainly indicates a purpose to impose strict liability, *recklessness* is sufficient

---

uniform. Judges have had to resolve disputes by referring to general principles of common law or equity, or they have sought guidance in statutes such as Article 4 which are applicable to other payment methods. But attempts to define rights and obligations in funds transfers by general principles or by analogy to rights and obligations in negotiable instrument law or

the law of check collection have not been satisfactory."

We recommend that the General Assembly consider legislation such as UCC 4A-102 in light of today's modern banking environment and in order to avoid sometimes strained interpretations of Ohio UCC Article IV.

culpability to commit the offense."
(Emphasis added.) A person acts
recklessly when, "with heedless indif-
ference to the consequences, he
perversely disregards a known risk
that his conduct is likely to cause a cer-
tain result or is likely to be of a certain
nature. A person is reckless with
respect to circumstances when, with
heedless indifference to the conse-
quences, he perversely disregards a
known risk that such circumstances
are likely to exist." R.C. 2901.22(C).
Thus, in the absence of the specifica-
tion of a culpable mental state in R.C.
1153.01, we hold that the culpable
mental state for unauthorized acts in
violation of R.C. 1153.01 is reck-
lessness.

In the case *sub judice,* the trial
court declined to instruct the jury that
the requisite mental state for the of-
fense of unauthorized acts was "intent
to injure or defraud," as charged in the
indictment.[22] Instead, the court
charged the jury that "[f]or the assign-
ing, transferring, cancelling or deliver-
ing of a note, draft, bond, mortgage,
judgment, decree or other written in-
strument belonging to the association
or raising or receiving money and in
the name of the association without the
authorization of the board of directors,
the culpable mental state is
recklessness." Accordingly, since we
have determined that the culpable
mental state for unauthorized acts is
recklessness, the jury in this case was
properly instructed in accordance with
the law. Therefore, Warner's fourth
proposition of law is overruled.

In Warner's fifth proposition of

law, he maintains that the trial court's
instruction to the jury was inconsistent
with the indictment.

In even-numbered counts two
through eighty-two, the grand jury in-
dicted Warner and others for
unauthorized acts, stating that they
committed the acts "with the intent to
injure or defraud the Bank." However,
as just decided in our discussion of
Warner's fourth proposition of law,
the culpable mental state for
unauthorized acts in violation of R.C.
1153.01 is recklessness. *State* v. *Bentz,
supra;* R.C. 2901.21(B); see, also, *State*
v. *Lisbon Sales Book Co., supra.*

R.C. 1153.01 does not, on its face,
state the culpable mental state for
committing the offense. Instead,
reference must be made to other
statutes and case law. See *State* v.
*Lisbon Sales Book Co., supra; State* v.
*Bentz, supra;* R.C. 2901.21(B).
Therefore, we will not impose
hypertechnical requirements not
already required for an indictment or
complaint. It is not necessary to set
forth the specific degree of culpability
in an indictment where the statute fails
to do so and it can readily be gleaned
by reference to other statutes or case
law. Consequently, we hold that the in-
dictment, although misstating the cor-
rect degree of culpability for violating
R.C. 1153.01, did meet minimal con-
stitutional standards.

Therefore, Warner's fifth proposi-
tion of law is overruled.

### X

### Ratification under R.C. 1153.01

In his sixth proposition of law,
Warner claims that the trial court

---

[22] Even-numbered counts two through
eighty-two, charging the defendants with
unauthorized acts, allege that Warner and
Schiebel, "as officers, agents or directors of
* * * [Home State], with the intent to injure
or defraud the Bank, did * * * assign,
transfer or deliver a note, bond, draft or
other written instrument belonging to the
Bank * * * to ESM, without the authoriza-
tion of the Bank's Board of Directors
* * *."

erred in failing to instruct the jury that subsequent ratification by the Home State board of directors of the acts charged in even-numbered counts two through eighty-two constituted a defense to the crime of unauthorized acts.

Warner submitted into evidence copies of board reports which had been distributed to and reviewed by the board of directors of Home State at their monthly meetings and which contained the figures necessary to calculate the collateralization rate of the association's repurchase agreements. Based on those reports, Warner and the other defendants requested that the trial court charge the jury that a board of directors may implicitly ratify, and thereby authorize, a previously unauthorized act if the board, with actual knowledge of the facts, either accepted or retained the benefits of the transaction, acquiesced in the transaction, or failed to repudiate the transaction within a reasonable time. The trial court denied Warner's proposed instruction and, instead, charged the jury that:

"In regard to the authorization of the board of directors, a corporation acts through its board of directors. Corporate actions are required by law to be authorized by the board of directors as a result of resolutions passed at meetings of the board, or they may be authorized or passed upon without a meeting, upon the affirmative vote or approval of, and in a writing or writings signed by all the directors.

"* * *

"You must determine what authority, if any, to manage investments, was delegated to the officers or agents of Home State, and whether that authority was exercised by those officers or agents as was authorized and delegated by the board of directors."

The trial court refused Warner's instruction on ratification based on its determination that the Revised Code *limits* corporate acts to those authorized by resolution passed at a formal meeting of the board of directors or by unanimous written consent of the board. See, generally, R.C. 1701.59, 1701.62 and 1701.54.

A well-settled doctrine of the law of agency is that a principal may ratify the acts of its agent performed beyond the agent's scope of authority, and such ratification relates back to the time of performance of the acts and binds the principal from that time. *State, ex rel. Riley Constr. Co.,* v. *East Liverpool Bd. of Edn.* (1967), 10 Ohio St. 2d 25, 29, 39 O.O. 2d 15, 18, 225 N.E. 2d 246, 249. In *Campbell* v. *Hospitality Motor Inns, Inc.* (1986), 24 Ohio St. 3d 54, 24 OBR 54, 493 N.E. 2d 239, we concluded that a corporation could be bound to a contract that was neither expressly authorized nor expressly ratified by its board of directors, thus reaffirming the established rule that "an unauthorized contract entered into by a corporate officer or agent may be impliedly ratified by the corporate board of directors where the directors have actual knowledge of the facts and (1) accept and retain the benefits of the contract, (2) acquiesce in it, or (3) fail to repudiate the contract within a reasonable period of time." *Id.* at 57, 24 OBR at 138, 493 N.E. 2d at 242.

However, as succinctly stated by the court of appeals, "[t]he issue before us * * * is not whether a corporation's board of directors may authorize corporate acts in ways other than those prescribed by statute, but whether subsequent action or inaction by the board of directors may relieve an officer, director or other agent charged with unauthorized acts of

criminal liability." The overwhelming weight of federal and state authority has rejected the defense of subsequent ratification, whether express or implied, where criminal acts have been alleged (*i.e.*, a violation of the Criminal Code). See, *e.g.*, *United States* v. *Larson* (C.A.7, 1978), 581 F. 2d 664, 668, fn. 5 (even if bank directors' action was construed as approval of action of bank president in placing bank funds in a noninterest-bearing account in another bank from which president obtained a loan on preferential terms, it would not be defense to a charge against the president of willful misapplication of bank funds, since the misapplication preceded the approval); *United States* v. *Acree* (C.A.10, 1972), 466 F. 2d 1114, 1118 (refusal by the trial court to admit minutes of meetings of bank's board of directors which generally referred to purchase of poor loans by defendant was not error, since subsequent ratification is no defense in a prosecution for willfully misapplying funds and credits of bank while an officer thereof); *United States* v. *Cauble* (C.A.5, 1983), 706 F. 2d 1322, 1354 (ultimate restitution is not a defense to the crime of willful misapplication of bank funds, because crime is complete when misapplication occurs); *Rieger* v. *United States* (C.A.8, 1901), 107 F. 916 (willful misapplication of funds of a bank without knowledge or consent of the bank is not changed, as to its criminal character, by the fact that the act subsequently became known to the officers of the bank, and that they impliedly consented thereto, by taking no action in regard to it); *Simpson* v. *United States* (C.A.9, 1916), 229 F. 940, 945 ("[t]he criminal act was complete when the certificate of deposit was issued without authority from the directors, and with intent to injure and defraud the association, and no act of the directors could change its character. The doctrine of ratification has but little application to the criminal law."); *Gilbert* v. *United States* (C.A.9, 1966), 359 F. 2d 285, 287 (the fact that taxpayers whose names the defendant endorsed on government tax-refund checks may have ratified his acts would not have rendered his conduct any less criminal); *Phillips* v. *State* (1956), 38 Ala. App. 632, 634, 91 So. 2d 518, 519 ("* * * ratification, condonation, or settlement of a claim by a prosecuting witness subsequent to the commission of the offense will not disturb a criminal prosecution"); *State* v. *Austin* (1923), 93 W.Va. 704, 117 S.E. 607, paragraph nine of the syllabus ("[w]here accused is charged with forging and uttering a bank check and the undisputed evidence is that the check was not drawn by the accused, but by a third party, no subsequent ratification of the drawing of the check will defeat the right of the state to prosecute for the offense of uttering it knowing it to be a forged instrument * * *"); *State* v. *Higgin* (1959), 257 Minn. 46, 50, 99 N.W. 2d 902, 906 (condonation or ratification is, ordinarily, no defense to a crime; if defendant had sufficient intent to defraud when he endorsed check in name of employer, employer's subsequent ratification of his act could not constitute a defense to a charge of forgery); *Lewallen* v. *State* (1958), 166 Tex. Crim. App. 287, 288, 313 S.W. 2d 293, 294 (board of directors of corporation could not ratify defendant's criminal act of embezzlement by acquiescence); *Breaker* v. *State* (1921), 103 Ohio St. 670, 671, 134 N.E. 479, 480 ("* * * a statutory crime is not a private wrong, but a public wrong; * * * the public, or state, is entirely indifferent to the personal feelings of the owner of property stolen. It is the state that is prosecuting the violation of its statute; on its own behalf, and not on behalf of the owner of the property").

Thus, for the reasons stated above, we find that the trial court properly instructed the jury and, therefore, overrule Warner's sixth proposition of law.

## XI
### Post-Trial Amendment

In the state's second proposition of law and Warner's seventh proposition of law, the issue is whether the trial court properly allowed the state to amend the indictment subsequent to Warner's conviction in order to reflect additional language contained in R.C. 1153.01.

Even-numbered counts two through eighty-two of the indictment, charging Warner with unauthorized acts, alleged only that he "did * * * assign, transfer or deliver a note, bond, draft or other written instrument belonging to the Bank * * * to ESM, without the authorization of the Bank's Board of Directors; a felony of the fourth degree * * *." Following the jury's verdict convicting Warner of unauthorized acts charged in even-numbered counts seventy-two through eighty-two, Warner moved pursuant to Crim. R. 29 for acquittal on the charges, urging that the wire transfers did not constitute a violation of R.C. 1153.01 as alleged in the indictment. Prior to sentencing, the state moved to amend the indictment as to the unauthorized acts counts in order to add the language to the effect that Warner "* * * did issue or put into circulation a warrant or other order" without board authorization. The trial court granted the state's motion to amend the indictment and denied Warner's motion for acquittal.

Thus, the difference between the two versions of the indictment is the substantive addition to the post-trial amended indictment that Warner issued or put into circulation "a warrant or other order."

As the court of appeals noted, in four separate instances the written instructions indicated that the proscribed unauthorized acts with which Warner was charged included not only the language "assign[ment], transfer or deliver[y] [of] a note, bond, draft or other written instrument," but also included the language "issu[ance] or * * * circulation [of] a warrant or other order." In comparing the transcripts of the oral jury instructions with the written jury instructions, we find that in both sets of instructions the trial court, with respect to violations of R.C. 1153.01, initially gave a verbatim recitation of the statute in its entirety. Furthermore, in the written instructions the trial court cited the clause "issu[ance] or * * * circulation [of] a warrant or other order" along with the rest of the statute in its introduction to the unauthorized acts counts. However, the specific instructions for each count alleging violations of R.C. 1153.01 required the jury to consider only whether Warner assigned, transferred or delivered a note, bond, draft or other written instrument.

Thus, the written instructions recited the entire statute in various introductory remarks, while the instructions for the actual counts for which Warner was ultimately convicted set forth only the pertinent language of the statute necessary to support criminal liability. Therefore, there were no material differences between the oral and written instructions since both contained the essence of the charge and the specific conduct which was attributable to Warner. In light of the discussion above, we find that the trial court erroneously granted the post-trial amended indictment, since the state's case and jury instructions (oral and written) were consistent with the original amended indictment. Thus, we conclude that Warner was

not prejudiced[23] by the post-trial amendment because his conviction was supported by the original amended indictment.

Accordingly, the state's second proposition of law is sustained, while Warner's seventh proposition of law is overruled.

## XII
### Restitution

In the state's seventh proposition of law and Warner's fifteenth and sixteenth propositions of law, the issue is whether the trial court properly ordered Warner to remit $22,000,000 in restitution for damages arising from his unauthorized acts and securities violations.

The state suggests that the $22,000,000 could be based on two components: (1) $12,200,000 for the six unauthorized acts of which Warner was convicted, and (2) $10,700,000 for Warner's three securities violations.

As a threshold to this issue we must respond to Warner's assertion that restitution was improper since financial losses are not "property damages" within the meaning of R.C. 2929.11. Warner was convicted of six unauthorized acts under R.C. 1153.01 and three securities violations under R.C. 1707.44, all fourth degree felonies. R.C. 1153.99 and 1707.99. For a fourth degree felony, R.C. 2929.11 provides in pertinent part:

"(E) * * * the court * * * may require a person who is convicted of or pleads guilty to a felony to make restitution for all or part of the property damage that is caused by his offense and for all or part of the value of the property that is the subject of any theft offense, as defined in division (K) of

section 2913.01 of the Revised Code, that the person committed."

"Property," as the term is used in the Revised Code, is defined as "any property, real or personal, tangible or intangible, and any interest or license in such property." R.C. 2901.01(J). And R.C. 2913.01(K) defines a "theft offense" as "* * * (3) [a]n offense under an existing or former municipal ordinance or law of this or any other state or the United States involving robbery, burglary, breaking and entering, theft, embezzlement, wrongful conversion, forgery, counterfeiting, deceit, or fraud; (4) [a] conspiracy or attempt to commit, or complicity in committing any offense under division (K) * * * (3) of this section."

Clearly, the term "property," as used in R.C. 2929.11(E), is sufficiently broad to include financial damages. There is no evidence that the General Assembly intended to restrict the meaning of the term property damages to physical damage to property. Therefore, we will not graft a narrow interpretation of the term "property" and, consequently, a court may order a defendant to pay restitution for financial damages pursuant to R.C. 2929.11.

Furthermore, the term "theft" includes the commission of unauthorized acts in violation of R.C. 1153.01, since these acts are in essence the wrongful conversion of property. Similarly, "theft," as defined in R.C. 2913.01 (K)(3), encompasses securities fraud or acts which are tantamount to fraud, e.g., violations of R.C. 1707.44(B)(4), (G) or (J). Thus, an order to pay restitution for committing unauthorized acts and securities fraud or violations tantamount to fraud is permissible under the Revised Code.

---

[23] Since we have concluded that there were no material deviations between the oral and written jury instructions, any error

with respect to Warner's inability to review the written instructions was harmless.

Having established that an order of restitution could be imposed upon Warner for any property damage or loss caused by his criminal acts, our next task is to determine whether the trial court's order was supported by sufficient evidence.

Prior to sentencing, the state and Warner submitted memoranda on the issue of restitution. Also, the trial court conducted a hearing and took evidence. In reviewing the record, which includes the testimony of Gerald Stephens, a former Home State senior vice president, we find that $12,200,000 of the approximate $140,000,000 loss suffered by Home State was due to the six unauthorized acts Warner was convicted upon. Specifically, the evidence at trial supported the allegations that Warner transferred $2,500,000 on August 29, 1983, $1,700,000 on August 31, 1983, $2,700,000 on September 15, 1983, $1,800,000 on September 16, 1983, $3,000,000 on October 12, 1983, and $500,000 on October 14, 1983 to ESM without the authorization of Home State's board of directors. There is no evidence in the record to suggest that Home State ever recovered the $12,200,000 that was transferred. Thus, $12,200,000 of the trial court's restitution order was supported by competent, credible evidence and was not against the manifest weight of the evidence.

However, in addition to the $12,200,000 in actual losses, the state alleged that Home State debenture holders lost $10,775,463 from the sales or exchanges during the 1984 debenture offering. The record discloses that Home State sold or exchanged debentures from September through November 1984, which were scheduled to become due October 31, 1989, in the following amounts:

"a. 1989 debentures exchanged for 10/31/84 debentures — $5,875,500

"b. 1989 debentures exchanged for accrued interest on 10/31/84 debentures — $1,471,059

"c. sale of 1989 debentures for cash — $3,428,904

"Total 1989 debentures sold or exchanged — $10,775,463."

The overall losses suffered by depositors of Home State were calculated to be $129,000,000, which was ultimately paid by the Depositor Assistance Corporation, which obtained its funds by borrowing them from the state of Ohio.

The record reflects that at the time of Home State's collapse, it had debenture liabilities in excess of $26,000,000. Although over $10,700,000 was advanced by Home State in exchanges of the old debentures for new debentures in October 1984, there was seemingly no effect upon its existing liabilities. Basically, according to Gerald Stephens, the old debentures relieved Home State of approximately $30,000,000 worth of liabilities, in exchange for which Home State took on approximately another $10,700,000 in liabilities, which left a net effect of a reduction of $18,000,000 of liability. Also, he stated, when Home State collapsed in 1985, $11,000,000 in obligations was still outstanding from the 1984 public offering. Those obligations were subsequently satisfied by the state of Ohio. These statements seemingly are contradictory and unsupportable.

Although the state can account for approximately $10,700,000 in funds which were exchanged as a result of the fall 1984 offering, the record is not clear as to any *direct* losses sustained as a result of the exchanges. Instead, the record suggests that a net reduction in liability took place. The $11,000,000 in outstanding liabilities

attributed to the offering at issue is not broken down or traced to the offering circular anywhere in the record. This court is left to guess what losses flowed directly from the offering. We find there was insufficient evidence upon which the trial court could determine actual losses occasioned by the offering. Therefore, since in our view the record supports only $12,200,000 in actual losses, we must modify the trial court's order of restitution from $22,000,000 to $12,200,000,[24] and we remand this case to the trial court for further proceedings in order that the parties may be permitted to present evidence upon which losses, if any, from counts eighty-three, eighty-five and eighty-six may be determined.

Accordingly, the state's seventh proposition of law and Warner's fifteenth proposition of law are sustained in part, while Warner's sixteenth proposition of law is overruled.

## XIII

### Conclusion

For the reasons stated in this opinion and those referred to in *State* v. *Schiebel, supra,* the judgment of the court of appeals is reversed in case Nos. 89-584 and 90-84, and we reinstate defendant's conviction on even-numbered counts seventy-two through eighty-two for the commission of unauthorized acts and counts eighty-three, eighty-five and eighty-six for violations of the securities laws of Ohio. The order of restitution by the trial court is modified to $12,200,000, and we remand for further proceedings not inconsistent with this opinion.

*Judgment reversed*
*and cause remanded.*

MOYER, C.J., J. V. CORRIGAN, NAHRA, WRIGHT, H. BROWN and MC-CORMAC, JJ., concur.

JOHN V. CORRIGAN, J., of the Eighth Appellate District, sitting for SWEENEY, J.

JOSEPH J. NAHRA, J., of the Eighth Appellate District, sitting for DOUGLAS, J.

JOHN W. MCCORMAC, J., of the Tenth Appellate District, sitting for RESNICK, J.

---

[24] The order of restitution does not foreclose the state from seeking additional remedies against Warner for losses suffered by Home State and its depositors.