OPINION
Defendant-Appellant Jerry Reese appeals from his convictions and sentences for four counts of receiving stolen property and one count of possessing criminal tools.
On December 1, 2000, Reese and his co-defendant, Ahija Johnson, were arrested outside of Upper Valley Mall in Springfield, Ohio in a Chevy Blazer packed with thousands of dollars in new merchandise. When asked where they obtained the vehicle, the defendants responded that they had borrowed it, but they refused to say from whom. Then, when asked about the merchandise, they claimed to have no knowledge of its origins.
The Springfield Police stopped these individuals in the mall parking lot based upon a call from the Springfield Staples across the street from the mall. The situation began when the manager at the Huber Heights Staples had contacted the manager at the Springfield store that two tall, thin, well-dressed black males had attempted to purchase two high-end laptop computers with credit cards that would not swipe. When the sale could not be processed, the two men left the store under the pretense of obtaining another card from their vehicle. The men never returned. Because of this suspicious activity, the Huber Heights Staples manager called to warn other stores in case these men attempted any criminal activity at those stores.
As it happened, shortly thereafter, two tall, thin, well-dressed black males entered the Springfield Staples store and inquired about the exact same two laptops that the individuals had attempted to purchase in Huber Heights. The staff stalled the men while the manager called the police. However, the two men left before the police arrived. One employee saw them leave in a white 2000 Chevy Blazer with an "A" in the license plate number.
When police arrived, they went across the street to the mall and found a white Chevy Blazer with an "A" in the license plate number and surveilled the vehicle until the two men returned. At that point, the police effectuated a stop and discovered the merchandise inside.
Employees and/or managers from Lowes in Huber Heights, Staples in Sidney, and Foot Locker and C H Rauch Jewelers at the Upper Valley Mall testified regarding merchandise that had been purchased from their stores on December 1, 2000 with fraudulent credit cards. These stores produced receipts indicating that most of the items were purchased with an American Express card in the name of Kevin Smith and some with a Visa card in the name of George Sloaness. Most of the items appearing on those receipts corresponded with the bar codes on the merchandise found in the Chevy Blazer. Some of those who testified claimed that one or two tall, thin, well-dressed black men had made the purchases. None of the stores received payment for the purchases from the credit card companies.
The clerk from the Foot Locker store was the only person who requested identification at the time of the purchase. He did so because it was store policy to write down an individual's name and address when they purchased gift certificates. The clerk indicated that the man had produced a driver's license in the name of Kevin Smith, the same name as on the American Express card used to purchase $1000 in gift certificates. In addition, this clerk picked Johnson, Reese's co-defendant, out of a photo line-up as the individual who purchased the gift certificates. The Foot Locker clerk also stated that this man had been alone when he made the purchase.
After Reese and Johnson were in custody, an officer from the German Township Police Department brought the detectives four credit cards and a driver's license that were found inside Upper Valley Mall. The record is not clear regarding exactly where these items were located. In any event, the credit cards all bore the name of Kevin Smith. Furthermore, Johnson's picture was on the driver's license which also bore the name of Kevin Smith. One of these cards was the American Express used to purchase much of the merchandise found in the Blazer.
In addition, while the two men were in custody, they were required to empty their pockets in order for the officers to inventory their property. As a result of this inventory, the police found in Reese's pocket a piece of paper that listed several credit card numbers and expiration dates. One of those numbers matched the number on the American Express card in Kevin Smith's name that had been found in the mall and had been used to purchase the merchandise in the Blazer.
An eleven-count indictment was filed against Johnson and Reese. The counts against Reese were as follows: count I, receiving stolen property (Chevy Blazer); count VIII, possession of criminal tools (paper with credit card numbers); count IX, receiving stolen property (Lowes); count X, receiving stolen property (Staples); count XI, receiving stolen property (Foot Locker). Johnson was also included in Count I, and the other six counts were counts for receiving stolen property and theft counts against Johnson. The defendants were tried together with the same counsel. The jury convicted them on all eleven counts. Johnson was sentenced to a total of three years and Reese a total of five and a half years. Reese has appealed his conviction and sentence raising the following assignments of error:
 I. The trial court erred in overruling counsel's motion to withdraw from representation of appellant due to an obvious conflict of interest and failed to conduct an adequate inquiry into the issue.
 II. Appellant was denied the effective assistance of counsel at trial.
 III. The evidence presented at trial was insufficient as a matter of law to support a conviction for receiving stolen property (motor vehicle).
 IV. The evidence presented at trial was insufficient as a matter of law to support a conviction for receiving stolen property from the Foot Locker store.
 V. The evidence presented at trial was insufficient as a matter of law to support a conviction for possession of criminal tools and punishment for same applies the statute unconstitutionally to appellant.
 VI. The trial court erred in imposing a consecutive prison sentence for the conviction of receiving stolen property with regard to the Foot Locker gift certificates.
 VII. The trial court erred by imposing maximum consecutive sentences for the convictions of non-violent felonies of the fourth and fifth degree.
 I, II
Both the first and second assignments of error address whether Reese's trial counsel was operating under a conflict of interest. Accordingly, we will address these assignments of error together.
Throughout the proceedings in this case, Reese and Johnson were represented by the same attorney, Cozette Snead. On the day before trial was supposed to begin, Ms. Snead filed a motion to suppress on behalf of her clients. The trial court, delaying the start of trial, held a hearing and then overruled the motion. During this same time period, the prosecution made a plea offer in which both defendants could receive three years for all counts. The only contingency was that both defendants accept the offer.
After a few hours, the court and the parties came back on the record, and Ms. Snead reported that Johnson wanted to accept the plea but that Reese did not. At that point, the following colloquy occurred:
 MS. SNEAD: It has come to my attention that Mr. Johnson and Mr. Reese have different needs, desires, want to proceed differently. It is very difficult for me, then, to represent both of them at this time.
 I would ask to withdraw from Mr. Reese's case who indicated he wanted to obtain his separate counsel, and I would ask the Court to inquire further of Mr. Reese.
 THE COURT: Well, this only came up because of the plea agreement, I believe.
MS. SNEAD: I'm not sure if that's his only reason.
THE COURT: All right.
 Well, we're here at the trial; and the case has been pending six months. There doesn't appear to be any conflict at this point other than the statement that one defendant wanted to accept the plea agreement, the other one did not.
 The State has no obligation to make any modification to the indictment. They made a proposal. It was a joint proposal which, as indicated, was agreeable to one defendant and not the other, but that would not change the nature of the charges or the situation with respect to trial.Is there anything else you want to put on the record?
 MS. SNEAD: I don't know if Mr. Reese has any other reasons.
 THE COURT: Well, I don't either. Do you want your client to make a statement?
 MS. SNEAD: In reference to that issue, if he has anything further he would like the Court to know, yes, Your Honor.
THE COURT: All right.
 [MR.] REESE: Good afternoon. In deference for a request for a new counsel, it would be the fact that I felt that she filed the motion for — she filed the motion yesterday for — what was it?
MS. SNEAD: Suppression.
 [MR.] REESE: For suppression and I didn't think it was adequate amount of time for doing so. So it leads me to believe that it's a possibility that she would be ineffective as far as representing me. You know, she filed the motion yesterday. You heard it today.
 I mean, I just felt that she didn't have enough time to do so; and it should have been done before then and being that she filed it yesterday and you heard it today, there was no way within an amount of reason that she would have been properly prepared.
 If she's not properly prepared — wasn't properly prepared for that motion, then it leads me to believe there's a possibility that she's not properly prepared to represent me as my attorney on any other pleading factors involved here.
THE COURT: All right.
Thank you. You may be seated.
 Well, the Court doesn't find that point to be well taken. I think the available evidence on the issue on the Motion to Suppress was presented. The Court heard the probable cause issue, and the entire applicable evidence was considered.
 The timing of the motion doesn't affect the quality of the motion; however, the Court did hear the applicable evidence and clearly determined that the officer had probable cause for the stop and the search of the vehicle.
 Therefore, I don't find your attorney is inadequate. I know she's an experienced criminal lawyer, has considerable experience in criminal cases from her past appearances here in this court so I think you are represented by competent counsel; and she is prepared to go forward.
 I've heard nothing to the contrary that she isn't prepared. We were prepared to start this case earlier today, and with the motion it's now postponed until tomorrow so that we can proceed at 9 a.m. tomorrow on the merits of the case.
In cases of potential conflict of interest resulting from one attorney representing co-defendants, the Supreme Court has held that dual representation is not a per se violation of due process. Holloway v. Arkansas (1978), 435 U.S. 475, 482, 98 S.Ct. 1173, 1178, citing Glasser v. United States (1942), 315 U.S. 60, 92, 62 S.Ct. 457, 475. Indeed, in some cases, joint representation is preferable to launch a common defense against a common attack. Id. at 483. However, it is possible for a conflict to exist in every instance of multiple representation. Cuyler v. Sullivan (1980), 446 U.S. 335, 348, 100 S.Ct. 1708, 1718.
Both defense counsel and the court have an affirmative duty to ensure that conflicts do not interfere with a defendant's representation. State v. Dillon (1995), 74 Ohio St.3d 166, 167-68. Certainly, if defense counsel recognizes a potential conflict in her representation of both clients, she should timely object to her dual representation and move the court to withdraw from representing at least one of the two defendants. After all, an "attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial." Holloway, supra, at 485, 98 S.Ct. at 1179. Therefore, many courts have held that an attorney's request for appointment of separate counsel based on representations of conflict of interest should be granted. Id. (citations omitted). The Holloway Court more precisely found that, in a situation where an attorney does bring a potential conflict to the court's attention, the court should either appoint separate counsel or "take adequate steps to ascertain whether the risk [of conflict] was too remote to warrant separate counsel." Id. at 484,98 S.Ct. at 1178. Failure to make such an inquiry when faced with a timely objection deprives the defendant of his constitutional guarantee of effective assistance of counsel. Id. at 484, 98 S.Ct. at 1178-79. Consequently, when a court requires joint representation over objection without making sufficient inquiry, prejudice is presumed, and reversal is required. Id. at 488; 98 S.Ct. at 1181.
In some cases, however, neither counsel nor defendant raises an objection to the joint representation. In those cases, a trial court's duty to inquire only arises when it "knows or reasonably should know that a particular conflict exists * * *." State v. Manross (1988),40 Ohio St.3d 180, 181. Absent any indication to the contrary, a trial court may assume that either the joint representation presents no conflict or that the lawyer and clients have knowingly accepted the risk of any conflict that may exist. Cuyler, supra, at 347,100 S.Ct. at 1717. In those situations where no objection is raised to the trial court regarding the joint representation, on appeal, the appellant "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Id. at 348, 100 S.Ct. at 1718.
In light of the aforementioned discussion, our inquiry must begin with whether counsel or defendant raised a timely objection to joint representation that sufficiently alerted the trial court to a potential conflict. This initial inquiry is very close. Technically, on the day trial was to begin, counsel raised an objection to the trial court, stating that she and one of her clients desired that she withdraw from his representation because the defendants had "different needs, desires, want to proceed differently." This statement was made following the realization that a joint plea offer was made that one client wanted to take and the other did not. In response to counsel's "objection," the trial court questioned Reese regarding his desire to obtain separate counsel. Reese replied with a fear that his counsel would not be prepared for trial since she did not file the motion to suppress until the day before trial was to begin. At no time did he mention any conflict of interest. Of course, "[a]n individual defendant is rarely sophisticated enough to evaluate the potential conflicts * * *." State v. Mock (1972), 32 Ohio App.2d 82, 87 (O'Neill, P.J., concurring), citing Campbell v. United States (C.A.D.C. 1965), 352 F.2d 359, 360.
Nonetheless, after the court's inquiry of Reese, his counsel failed to further raise objection to the joint representation. Ms. Snead never pointed out any conflict in representing both defendants to the trial court beyond her statement that they had different needs and desires. In Holloway, defense counsel was appointed to represent three co-defendants in a criminal trial. Holloway, supra, at 477, 98 S.Ct. at 1175. Beginning a few weeks before trial up to the point the jury was empaneled, counsel made repeated motions to the trial court to appoint separate counsel for the defendants, citing conflict of interest as the reason. The trial court repeatedly denied these motions. During trial, defense counsel's pleas continued when each of his clients wanted to testify and he was placed in a position where he was unable to conduct direct examination of his own witnesses. Id. at 478. Still, the trial court refused to conduct an inquiry or appoint separate counsel. Even with this barrage of formal objections, motions and representations, the Supreme Court recognized that perhaps defense counsel may have presented the requests for separate counsel more vigorously and in greater detail. Id. at 485, 98 S.Ct. at 1179.[1]
We find that counsel's weak reference to the different needs and desires of her clients on the day trial was to begin and Reese's failure to mention conflict of interest as a basis for his request for separate counsel is insufficient to qualify as a "timely objection" to joint representation based on a conflict of interest. As a result, the trial court was only required to appoint separate counsel or conduct an inquiry if he knew or should have known that a possible conflict of interest existed. See, Cuyler, supra at 347, 100 S.Ct. at 1717. Therefore, even if we find an inquiry was required and not conducted, we can only reverse if we find an actual conflict in the record that affected Reese's defense. Id. at 348, 100 S.Ct. at 1718.
In this regard, "[a] possible conflict of interest exists where `interests of the defendants may diverge at some point so as to place the attorney under inconsistent duties.'" State v. Gillard (1997),78 Ohio St.3d 548, 552, citing State v. Dillon (1995), 74 Ohio St.3d 166,168. Accordingly, an actual conflict exists when the defendants' interests do at some point diverge with respect to a material aspect of the case. Id. at 553. In other words, an attorney represents conflicting interests "when, on behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose." Id., citing Manross, supra, at 182. In order for a defendant to demonstrate an actual conflict, he must first show "some plausible alternative defense strategy or tactic might have been pursued," that would not necessarily have been successful, but that had enough substance to be a viable alternative. Id., citing United States v. Fahey (C.A.1, 1985), 769 F.2d 829, 836. Next, the defendant must show that this alternative defense could not be privilege. Holloway, supra at 485,98 S.Ct. at 1179. Yet the point was made that objections to joint representation based on conflict of interest must be explicit and assertive.
The evidence demonstrated that the Chevy Blazer in Reese and Johnson's possession was stolen because it was rented with a fraudulent credit card. The Blazer was full of merchandise that was stolen that day by the use of fraudulent credit cards. Both defendants told police that they would not say who the Blazer came from and that they knew nothing about the merchandise inside. While it may appear on the surface that the case against Johnson was stronger than the case against Reese, we do not believe the facts were conducive to attempting a finger-pointing defense. Johnson was driving the stolen Blazer, he was identified by a clerk at one store, and his picture was on the driver's license bearing the same name as the fraudulent credit cards. However, most of the store clerks reported that two men made the purchases and that all of the purchases were made on that day. But more importantly, Reese had in his pocket a list of credit card numbers, including the one that was used to make many of the purchases that day. The facts inextricably tie both individuals to the whole situation. Moreover, neither defendant testified at trial, so there was no opportunity to even attempt any other defense. Accordingly, we do not find an actual conflict in the record; nor do we find that the trial court knew or should have known of any possible conflict which would have required further inquiry.
All that notwithstanding, even if we were to find that counsel did properly raise an objection to the joint representation, we find that the trial court conducted a sufficient inquiry to determine whether a conflict actually existed. When advised that Reese wanted separate counsel due to different needs and desires, the court specifically inquired of Reese why he desired separate counsel. Reese did not even allude to any conflict of interest, and counsel made no further comments regarding any potential conflict. Upon receiving such limited information, the trial court could have reasonably concluded that the potential for conflict was too remote to require separate counsel. See Holloway, supra, at 484, 98 S.Ct. at 1178.
Based on the foregoing, we find that the trial court did not err in overruling counsel's motion to withdraw because the request to withdraw did not sufficiently alert the court to a potential conflict of interest; and even if it had, the court conducted an adequate inquiry to determine that the potential for conflict was so remote that separate counsel was not required. Furthermore, because we found that Reese's counsel was not operating under a conflict of interest, we do not find that she rendered ineffective assistance. Accordingly, Reese's first and second assignments of error are overruled.
 III
In Reese's third, fourth and fifth assignments of error, he alleges that his convictions for counts I, XI and VIII respectively were insufficient as a matter of law. When an appellant alleges a sufficiency of the evidence error, the court must determine whether the evidence is "legally sufficient as a matter of law to support the jury verdict." State v. Clemons (1998), 82 Ohio St.3d 438, 444, citing State v. Thompkins (1997), 78 Ohio St.3d 380, 387. An appellate court's standard when presented with this question "is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. More specifically, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
In this assignment of error, Reese challenges his conviction for receiving stolen property; to wit, the 2000 Chevy Blazer. In order to be found guilty of receiving stolen property, it must be shown that the defendant "received, retained, or disposed of property of another knowing or having reasonable cause to believe that the property had been obtained through the commission of a theft offense." R.C. 2913.51. A theft occurs when a defendant, with purpose to deprive the owner of property, knowingly obtains or exerts control over the property by deception. R.C.2913.02.
There was ample evidence in the record that this vehicle was rented from Avis with a fraudulent credit card, which is theft by deception. See R.C. 2913.02(A)(3). In addition, both Reese and his co-defendant were found in the vehicle and had no plausible explanation of where the vehicle came from. They both claimed it was borrowed, but would not say from whom. In addition, there was considerable evidence in the record implicating both of these individuals in fraudulent credit card operations, including the list of credit card numbers, the credit cards and driver's license with the name Kevin Smith, and the merchandise found in the vehicle that had been purchased by fraudulent credit card. Furthermore, the rental agreement from Avis was in the glove compartment of the vehicle.
A jury may infer that a defendant has knowledge of facts based on the surrounding circumstances. State v. Warner (1990), 55 Ohio St.3d 31,57. More specifically, a jury may infer guilty knowledge based on a defendant's failure to satisfactorily explain his possession of stolen property. State v. Wilson (1985), 21 Ohio App.3d 171, 172; State v. Caldwell (Nov. 16, 2000), Franklin App. No. 99AP-1107, unreported, at p. 7. Based on all of the evidence, the jury could infer that Reese and Johnson had knowledge or at least reasonable cause to believe that this vehicle was obtained through theft by deception.
It is also irrelevant that Reese happened to be the passenger in the vehicle. The chain of thefts throughout the morning were committed mostly by two men, generally fitting Reese and Johnson's description. Merchandise stolen through use of fraudulent credit cards was found in the vehicle with these two men. And most importantly, a list of credit card numbers, including one used to purchase much of the merchandise, was found in Reese's pocket. This is sufficient evidence to tie Reese, the passenger, to the circumstances that allowed the jury to infer guilty knowledge that the vehicle was stolen. See, generally, State v. Johnson (2001), 93 Ohio St.3d 240, 243-44.
When viewing this evidence in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Reese received or retained this vehicle with reasonable cause to believe it was stolen. Accordingly, Reese's third assignment of error is overruled.
 IV
Reese claims in his fourth assignment of error that evidence was insufficient to support his conviction for receiving stolen property relating to the Foot Locker gift certificates. The gift certificates were found in the door pocket on the driver's side of the Blazer. In addition, the evidence demonstrated that Johnson alone entered the Foot Locker store and purchased the gift certificates with the fraudulent credit card.
While we agree that the evidence supports the theory that Johnson actually purchased the gift certificates with the fraudulent credit card, this does not negate Reese's culpability for receiving the stolen property. The state need not demonstrate that Reese had actual possession of the gift certificates in order to prove a violation of R.C. 2913.51; instead, it must only show that he had constructive possession. Constructive possession may be proven by showing that Reese had knowledge of the presence of the stolen gift certificates and had the ability to exercise dominion or control over them. See, e.g., State v. Applewhite (Jan. 26, 2000), Medina App. No. 2958-M, unreported, at p. 4, citing State v. Butler (1989), 42 Ohio St.3d 174, 176. Furthermore, Reese's constructive possession could be established by circumstantial evidence. State v. Hankerson (1982), 70 Ohio St.2d 87, 90-91 (citations omitted).
As with the previous assignment of error, we believe the jury could reasonably infer that Reese had knowledge that the gift certificates were in the vehicle and that they were purchased with a fraudulent credit card. Notwithstanding that the certificates were on the driver's side of the car, the evidence inextricably tied both driver and passenger to all of the events of the morning, culminating in joint possession of a stolen vehicle full of stolen merchandise. The fact that these particular items were on the driver's side of the vehicle does not eliminate the reasonable inference that Reese knew the stolen gift certificates were there and could exercise control over them. Accordingly, Reese's fourth assignment of error is overruled.
 V
Reese argues in his fifth assignment of error that a list of credit card numbers could not qualify as a criminal tool to prove violation of R.C. 2923.24, which states: "No person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally." The statute further states that the following establishes a prima facie case of possession of criminal tools: "Possession or control of any substance, device, instrument, or article commonly used for criminal purposes, under circumstances indicating the item is intended for criminal use." R.C. 2923.24(B)(3).
The police found a piece of paper in Reese's pocket containing a list of credit card numbers and expiration dates. Some of the numbers had names listed above them. One of the credit card numbers corresponded with the number on a fraudulent American Express card which was used to purchase thousands of dollars in merchandise on that same day. The state established that at least the American Express card number actually belonged to the account of a separate individual, not named Kevin Smith.
The state has not argued that the piece of paper itself is a criminal tool, but possession of the numbers, particularly in light of the surrounding circumstances, established a prima facie case that they were instruments intended to be used for criminal activity. Aside from criminal activity, what other purpose could an individual have for possessing the credit card number of one person that had been used to make credit cards in another person's name? Consequently, we find there was sufficient evidence to support Reese's conviction for possession of criminal tools, and his fifth assignment of error is overruled.
 VI
In his sixth assignment of error, Reese argues that the trial court erred in sentencing him separately for all of the receiving stolen property counts. In particular, he argues that the Foot Locker receiving stolen property count should merge with the others. Reese relies on State v. Sanders (1978), 59 Ohio App.2d 187, for the proposition that an individual cannot be convicted and sentenced separately for several counts of receiving stolen property when the property was possessed at the same time and there is no separate animus toward each owner. In Sanders, the evidence revealed that the defendant came to possess the stolen property all at one time. Id. at 188. Although the items were stolen from different owners at different times, the evidence indicated that Sanders purchased all four items from a person on the street in a single transaction. The court held that all four counts were allied offenses of similar import and were not committed with a separate animus as to each. Id. at 191. Evidence that the items were stolen at separate times from separate people was insufficient to demonstrate a separate animus since the evidence demonstrated that Sanders received all of the items at one time. Accordingly, the court found that Sanders could not be convicted of four separate crimes of receiving stolen property. Id. at 192.
This court distinguished Sanders in State v. Bragg (Jan. 18, 1984), Montgomery App. No. 8155, unreported. In Bragg, several different items of stolen property were found in Bragg's home during the execution of a search warrant. Similarly, the evidence indicated that the items were stolen on at least three separate occasions. We agreed in Bragg the items having been stolen on separate occasions was not sufficient to allow separate convictions for each offense, as in Sanders. However, there was evidence that Bragg had committed the offenses separately with a separate animus toward each owner. Id. at p. 3. Unlike Sanders, the evidence did not indicate that Bragg received all of the items in the same transaction; in fact, evidence to the contrary was found in the record. The officers testified that Bragg had told them where he believed he obtained each item, which revealed that none of the items were obtained at the same time or from the same location. In addition, Bragg admitted that the low price suggested to him that the items may have been stolen. We found that this evidence established a separate animus toward each owner of the stolen property. Accordingly, we held that Bragg could properly be convicted and sentenced for separate counts of receiving stolen property. Id.
The facts in the present case are more analogous to those in Bragg than in Sanders. While Reese was found in possession of all of the property at one time, the evidence indicated that at least three thefts that produced this stolen property were committed that morning. The evidence revealed that one or two men generally matching the description of Reese and his co-defendant committed the thefts and that the merchandise was purchased with fraudulent credit cards, one number of which was found in Reese's pocket. The record is devoid of any evidence that Reese obtained this property all in one transaction. In fact, when asked about the property, he responded that he knew nothing about it. Therefore, the only evidence indicated that Reese did not obtain this property in one transaction, and, as such, a separate animus toward each owner was established. Accordingly, we find that Reese was properly convicted and sentenced separately for each offense. His sixth assignment of error is overruled.
 VII
In his final assignment of error, Reese challenges the trial court's imposition of maximum and consecutive sentences for each count. Reese was convicted of four fifth degree felonies and one fourth degree felony. We first must consider whether prison terms were appropriate since community control sanctions are generally preferred for fourth and fifth degree felonies. See State v. Cochran (June 1, 2001), Montgomery App. No. 18424, unreported, at p. 3 (finding that R.C. 2929.13 does not give rise to a presumption in favor of community control, but instead offers general guidance and a "disposition against imprisonment" for fourth and fifth degree felonies) (citations omitted). In fact, we must determine if the trial court made a finding giving reasons to support imposition of a prison term for a felony of the fourth or fifth degree as required by R.C. 2929.19(B)(2)(a). See, also, State v. Edmonson (1999),86 Ohio St.3d 324, 328-29.
Pursuant to R.C. 2929.13(B)(2)(a), a court shall sentence a defendant to a prison term for a fourth or fifth degree felony if:
 the court makes a finding described in division (B)(1)(a), (b), (c), (d), (e), (f), (g), or (h) of this section and if the court, after considering the factors set forth in section 2929.12 of the Revised Code, finds that a prison term is consistent with the purposes and principles of sentencing set forth in section 2929.11 of the Revised Code and finds that the offender is not amenable to an available community control sanction * * *.
Division (B)(1) states: "(e) The offender committed the offense for hire or as part of an organized criminal activity," and "(g) The offender previously served a prison term." The trial court found both of these to be true and supported these findings with evidence in the record:
 [T]he Court finds in addition to the prior prison term served by the defendant that the factors to be considered are that the offense appears in the Court's mind to be organized criminal activity, and it does by the repeated use of the credit card and does appear to be a pattern or scheme to defraud people through the use of their credit card. And it also appears to be a crime that was engaged in for profit; and, in fact, considerable profit could be realized from the expensive merchandise obtained in simply just this single day of criminal activity which encompassed not only Clark County but Montgomery County and Shelby County."
Next, pursuant to R.C. 2929.13(B)(2)(a), the court was required to consider the seriousness and recidivism factors in R.C. 2929.12. The factors in this statute relevant to the present case are as follows:
 (B)(7) The offender committed the offense for hire or as a part of an organized criminal activity.
 (D)(2) The offender previously was adjudicated a delinquent child pursuant to Chapter 2151. of the Revised Code, or the offender has a history of criminal convictions.
 (D)(5) The offender shows no genuine remorse for the offense.
After addressing each of these factors and the purposes and principles of sentencing found in R.C. 2929.11, the court properly determined that the evidence weighed in favor of sentencing Reese to a prison term for each of his offenses.
Subsequently, the court found that Reese should be sentenced to the maximum prison term allowable for his offenses. In making this determination, the court was required to consider R.C. 2929.14(C), which allows imposition of the maximum sentence in four situations: (1) when the offender committed the worst form of the offense; (2) when the offender poses the greatest likelihood of committing future crimes, (3) certain major drug offenders; and (4) certain repeat violent offenders. In this regard, the trial court found that Reese's crimes were the worst form of the offense because the facts revealed extensive use of the fraudulent credit cards, as opposed to a single occasion. Even Reese indicated at the sentencing hearing that this activity had been ongoing for some time. Moreover, the court considered lack of restitution to the owners as a factor contributing to make Reese's offenses the worst form. It was also implied throughout the sentencing hearing that Reese's prior convictions in 1992, 1993 and two in 1995 potentially involving similar circumstances were a factor considered in imposing maximum sentences.
Finally, the court concluded that Reese should serve each of his five sentences consecutively. R.C. 2929.19(B)(2)(c) requires that the trial court make specific findings on the record supporting imposition of consecutive sentences. Edmonson, supra. If those findings and reasoning were not part of the record, the case must be remanded for resentencing. Id. at 329. To determine whether consecutive sentences were proper, the trial court must address R.C. 2929.14(E)(4), which provides:
 If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
* * *
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
In addressing consecutive sentences, the court first found both (b) and (c) above were applicable to Reese's crimes, specifically citing the language of the statute. Next, the court found that Reese's criminal history demonstrated that consecutive terms were necessary to protect the public, satisfying the first requirement in the statute for consecutive sentences. In addition, the court stated the following:
 I find that the crimes were committed with prior calculation and design. There was planning. There was preparation; and the preparation of the cards, the driver's license, the criminal tools used in the commission of the offense and a pattern to search out certain stores or certain goods which might be marketable as stolen property.
We find that this statement by the trial court satisfies the second requirement in the consecutive sentences statute, which requires that the court find "that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." It appears that the court illustrated the seriousness of Reese's conduct in order to demonstrate that consecutive sentences were not disproportionate.
Based on the foregoing discussion, we find that the trial court complied with the sentencing statutes in imposing maximum and consecutive sentences for Reese's crimes. Accordingly, Reese's seventh assignment of error is overruled.
Judgment affirmed.
FAIN, J., and HILDEBRANDT, J., concur.
(Hon. Lee H. Hildebrandt, Jr. of the Court of Appeals, First Appellate District, Sitting by Assignment of the Chief Justice of the Supreme Court of Ohio).
[1] The Holloway Court went on to find that more vigorous requests would likely have also been rejected and greater detail could have violated attorney-client pursued because of an inherent conflict with counsel's representation of the co-defendant. Id. We find no evidence in the record that would have alerted the trial court to such a conflict.